339 So.2d 204 (1976)
Glen Stark CHAMBERS, Appellant,
v.
STATE of Florida, Appellee.
No. 47888.
Supreme Court of Florida.
November 4, 1976.
Gerald C. Surfus of Stinnett, Surfus & Martin, Sarasota, for appellant.
Robert L. Shevin, Atty. Gen., and A.S. Johnston, Asst. Atty. Gen., for appellee.
PER CURIAM.
This cause is before us on direct appeal to review the judgment of guilty of murder in the first degree and sentence of death. Article V, Section 3(b)(1), Florida Constitution.
Appellant was indicted for the first degree murder of Connie Weeks in that he unlawfully and from premeditated design to effect her death did strike, assault, and mortally injure her. The jury returned a verdict of guilty as charged, and after sentencing hearing, recommended that appellant be sentenced to life imprisonment since the jury found that sufficient mitigating circumstances existed so as to outweigh the aggravating circumstances. However, the *205 trial judge determined that under the circumstances, the death penalty was appropriate. In his judgment and sentence, the trial judge explained:
"It is the sentence and judgment of this court that you, for your said offense be committed to the Florida State Prison, and that you be sentenced to death, the court finding under Florida Statutes, Chapter 921, that there are no significant mitigating circumstances, and that sufficient aggravating circumstances exist. The defendant, who has a significant history of drug usage, was under the influence of some mental or emotional disturbance, but any such distrubance was self-induced by the use of illegal drugs and is not a mitigating circumstance. The murder was `especially heinous, atrocious and cruel.' The victim, a young girl, was brutally beaten by the defendant. Her brain was battered by a continuing, massive, indiscriminate beating.
"The other aggravating and mitigating circumstances contained in Chapter 921, Florida Statutes, are not applicable."
The facts leading up to the death of Connie Weeks are as follows. Appellant and the victim had been living together for several months. On the evening of January 22, 1975, appellant dragged the victim from the car in which she was sitting in the parking lot of her place of employment, across the parking lot and commenced to beat her. At this time, he was arrested, taken to the Sarasota County jail, and charged with two counts of assault. Later that same evening, the victim went to the police department to bond appellant out. The victim returned with him to their residence where appellant apparently informed her that he was leaving. A vehement argument ensued and the victim was so severely beaten that she died five days later as a result of said beating from cerebral and brain stem contusion. She was bruised all over the head and legs, had a deep gash under her left ear; her face was unrecognizable, and she had several internal injuries.
Appellant contends that a verdict should have been directed for him since the evidence was legally insufficient to prove premeditation. With this contention, we cannot agree. The record before us is more than adequate to support the jury's finding of premeditation. The State posits that the record contains competent sufficient evidence to find that appellant inflicted the mortal wounds with the requisite premeditated intent existing several hours prior to the successful conclusion of his criminal design.
Brenda Austin testified:
"Q (By Mr. Klaus) Did you have an opportunity to see Mr. Chambers again that morning?
"A Yes.
"Q About what time was that?
"A About 11:30.
"Q And where were you when you saw him?
"A Robarts Sports Arena.
* * * * * *
"Q (By Mr. Klaus) Okay. Now, she  he looked inside the van. And did he say anything to you while he was looking inside the van?
"A Yes.
"Q What did he say?
"A He asked me where Connie was.
"Q Now, how did he appear to you at that time?
"A Mad.
"Q Okay. Now, did he appear that  did you smell any alcohol or 
"A No.
"Q Did he walk all right?
"A Yes.
"Q How mad was he?
"A Mad.
"Q Real mad?
"A Real mad.
"Q Now, did he say anything to you about Connie?
"A Yes.
"Q What did he tell you?
"A He told me that when I saw her to tell her that he had tore up the house and *206 he was going to tear up her can and then he had taken some money and was going to leave for New York that day, and that if I saw her to tell her that he was going to beat her head in.
"Q And this is during the time that he was mad?
"A Yes.
"Q And, now, you've seen people who have been under the influence of narcotic drugs or alcohol before?
"A Yes.
"Q Did he appear  have you seen Glenn Chambers under those influences?
"A Yes.
"Q Did he appear to be at all under any influence of anything at that time?
"A No. No."
Joan Berryman, the victim's employer, testified:
"A He drug her the full length of the parking lot, smacking her in the mouth, hitting her in the head, pulling her hair, tearing her clothes off.
"Q Now, let's back up a little bit. You said he dragged her the full length of the parking lot. Can you show the dimensions of this courtroom, or is it longer than this courtroom?
"A It's a little longer than this courtroom. Maybe another half as long.
"Q Okay. And for that full distance she was drug?
"A Right.
"Q Was she walking on her own at any time?
"A No.
"Q And how was she drug, again?
"A By her hair and by her clothes.
"Q Okay. Now, can you describe with your  showing us with your hands how he grabbed her and how he hit her?
"A He grabbed her by the head of her hair and he was hitting her in the face. Then she'd fall down and he'd pick her up and he'd pick her up and drag her and kept tearing her clothes and I kept following him and asking him to please don't hit her, please leave her alone.
"Q Did he have anything to say to that?
"A He told me to call the God damn cops.
"Q Did he say anything else?
"A He said because he was going to kill her. He said, `Go and call the God damn cops because I'm going to kill her.'
* * * * * *
"Q Okay. Now, have you ever seen Glenn under the influence of either drugs or marijuana or alcohol?
"A I guess I've seen him under a couple.
"Q Okay. Did he appear that night to be influenced at that time?
"A At that time to me he was angry. He was really, really angry.
"Q Had you ever seen him that mad before?
"A No.
"Q Had you seen him numerous times before?
"A Yes.
"Q Have you ever seen him mad?
"A Not this mad.
"Q But you've seen him mad?
"A Seen him mad."
Colleen Cole testified:
"A He asked me if I had seen her and I said no. He asked me if I knew where she was and I said no. He said, well, when he found her he was going to kill her."
As the State submits, appellant by his own testimony admits the terrible beating of the victim and his sole defense is that he did not intend to kill her. Thus the question requiring resolution by this Court is whether there was sufficient evidence adduced at trial, direct or circumstantial, to prove premeditation on the part of appellant at the time he inflicted the mortal wounds. We find that there was sufficient evidence to support the jury's determination of premeditation. Although appellant admits the beating which resulted in the death of Connie Weeks, he submits that his capacity to form premeditation was diminished by the fact that he was under the *207 influence of illegal drugs. The mental condition of appellant at the time of the crime and prior thereto on the day of the crime was thoroughly dealt with in the testimony of State's witnesses at the time appellant made the numerous threats to kill the deceased. The record contains sufficient evidence to contradict appellant's contention that he was under the influence of drugs. As this Court stated in Songer v. State, 322 So.2d 481 (Fla. 1975), wherein defendant alleged that he was so intoxicated by drugs as to negate his ability to premeditate the murder:
"Recognizing the established principle that, where a jury's verdict is supported by competent substantial evidence, an appellate court should not substitute itself as the trier of the fact, we accept the jury's evaluation of the evidence; in doing so, we specifically reject Appellant's contention that a defendant's interpretation of circumstantial evidence should be accepted completely unless it is specifically contradicted."
In Dawson v. State, 139 So.2d 408 (Fla. 1962), this Court opined:
"Premeditation may be inferred from the circumstances just as other inferences of fact may be drawn by the jury. Parker v. State, 1940, 142 Fla. 210, 194 So. 484; Crawford v. State, 1941, 146 Fla. 729, 1 So.2d 713; Robinson v. State, 1941, 148 Fla. 153, 3 So.2d 804.
"In this case we think the circumstances were more than adequate to support an inference of premeditation.
"According to appellant's confession Mrs. Clayton threw a hammer at him but he was not struck by it. There is no evidence to indicate that she was armed in any way or that she pursued the encounter beyond grabbing appellant by the collar. He was in the front seat of the station wagon, she in the seat behind him. When found Mrs. Clayton was lying in the back seat with one arm upraised over her head. The medical evidence showed that she had suffered not one blow, but multiple cerebral contusions and skull fractures, all sufficient to produce death; a dislocated left shoulder; and a wound in the left temple extending through and fracturing the jaw and knocking out a tooth.
"Whatever the appellant's state of mind might have been at the beginning of the `tussling', the number of blows struck, the force employed, the unarmed status of Mrs. Clayton and the other circumstances surrounding the unfortunate incident indicate that there was sufficient time for appellant to have formed the intent to kill Mrs. Clayton and that he did form and carry out this design. The facts established were sufficient to support the inference obviously drawn by the jury that appellant did effect the death of Mrs. Clayton by premeditated design. This would be sufficient to supply this element in the killing of Roger Glenn Clayton as well."
Most recently in Alvord v. State, 322 So.2d 533 (Fla. 1975), this Court reiterated:
"The jury is charged with the responsibility of resolving factual conflicts. When it is shown that the jurors have performed that duty faithfully and honestly and reached a conclusion that squares with reason, it takes more than a difference in opinion as to what the evidence shows for this Court to reverse them. The conflicts were resolved in favor of the State and the evidence was sufficient as a matter of law to sustain the verdicts. See State v. Smith, 249 So.2d 16 (Fla. 1971)."
The majority of the points raised on appeal sub judice are directed to the imposition of the death penalty by the trial court in light of the particular facts of this case. Although, we do not agree with appellant that Florida's death penalty statute constitutes cruel and unusual punishment or is violative of the equal protection and due process clauses of the Constitution of the United States, we do find that the totality of the circumstances existent in the instant cause, and the weighing of mitigating and aggravating circumstances do not warrant imposition of the death penalty. Rather, we must determine that the jury's *208 recommendation of a life sentence was appropriate.
Having considered the other points raised on appeal by appellant, we find none of them so meritorious as to constitute reversible error.
We have listened carefully to oral argument, examined and considered the record in light of the assignments of error and briefs filed, and we have also, pursuant to Rule 6.16(b), Florida Appellate Rules, reviewed the evidence to determine whether the interests of justice require a new trial, with the result that we find no reversible error is made to appear and the evidence in the record before us does not reveal that the ends of justice require that a new trial on the issue of guilt be awarded.
Accordingly, appellant's conviction for murder in the first degree is affirmed; however, the order of the trial court sentencing appellant to death is quashed and the trial judge is directed to sentence Glenn Stark Chambers to life imprisonment.
It is so ordered.
OVERTON, C.J., and ROBERTS, ADKINS, BOYD, SUNDBERG and HATCHETT, JJ., concur.
ENGLAND, J., concurs with an opinion, with which ADKINS and SUNDBERG, JJ., concur.
ENGLAND, Justice (concurring).
I fully concur in the Court's disposition of this case, but I believe it appropriate to state more specifically why I consider the death penalty inappropriate on the facts of this case.
Contrary to the recommendation of the jury, the trial judge in this case imposed the death penalty on the ground there existed one aggravating circumstance  that the murder was committed in a heinous, atrocious and cruel manner  without any significant offsetting mitigating circumstance.[1] Although the trial judge found appellant to have been under the influence of some mental or emotional disturbance at the time of the crime, he rejected that factor as a mitigating circumstance because the condition was self-induced by the use of illegal drugs.[2] I believe it essential to articulate our reconciliation of this factual circumstance with other death penalty cases.[3]
In Tedder v. State, 322 So.2d 908 (Fla. 1975), we emphasized the weight to be given jury recommendations in capital cases and held that a death penalty is inappropriate following a jury recommendation of life imprisonment unless the facts suggesting death were so clear and convincing that virtually no reasonable person could differ. The considerations underlying that decision were further explained in Cooper v. State, 336 So.2d 1133 (Fla. 1976), a case involving a jury recommendation of death. There we elaborated on the respective functions of the judge and jury in death penalty cases, explaining that the judge's role is primarily to insure the jury's adherence to law and to protect against a sentence resulting from passion rather than reason. Our directive there that the jury's advisory function may not be distorted by the omission of any aggravating or mitigating circumstance (absent acquiescence by all parties) was a calculated step to insure that a jury and judge could never reach differing conclusions on a sentence as a result of misunderstanding the law or applying different standards to the peculiar facts before them.
Tedder and Cooper espouse the same guidelines. Where a jury and a trial judge reach contrary conclusions because the facts derive from conflicting evidence, or where they have struck a different balance between *209 aggravating and mitigating circumstances which both have been given an opportunity to evaluate, the jury recommendation should be followed because that body has been assigned by history and statute the responsibility to discern truth and mete out justice. Given that the imposition of a death penalty "is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment ...",[4] both our Anglo-American jurisprudence and Florida's death penalty statute favor the judgment of jurors over that of jurists.
On the record before us, it does not appear that the jury struck an impassioned and unreasoned balance when it recommended life imprisonment. Our death penalty statute lists as mitigating circumstances the fact that a defendant "was under the influence of extreme mental or emotional disturbance",[5] as to which there was conflicting evidence, and the fact that the victim consented to the act causing death.[6] The jury had evidence in abundance that appellant and Connie Weeks had voluntarily shared a long-standing sado-masochistic relationship which included severe and disabling beatings. They also knew that Connie Weeks had herself obtained appellant's release from jail on the very day he had beaten and dragged her through the streets in an unholy rage. In light of the Legislature's enumeration of the factors to be weighed before effecting state executions, the facts suggesting a sentence of death in this case are not so clear and convincing that reasonable people could not believe life imprisonment justified.
ADKINS and SUNDBERG, JJ., concur.
NOTES
[1] This weighing of circumstances is directed in these cases by Section 921.141, Fla. Stat. (1975). State v. Dixon, 283 So.2d 1 (Fla. 1973).
[2] The Court here correctly notes that the evidence regarding appellant's alleged use of drugs was conflicting.
[3] Proffitt v. State, ___ U.S. ___, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
[4] State v. Dixon, 283 So.2d 1, 10 (Fla. 1973).
[5] Section 921.141(6)(b), Fla. Stat. (1975).
[6] Section 921.141(6)(c), Fla. Stat. (1975).