496 So.2d 822 (1986)
Hector Manuel IRIZARRY, Appellant,
v.
STATE of Florida, Appellee.
No. 66947.
Supreme Court of Florida.
October 30, 1986.
James Marion Moorman, Public Defender, Tenth Judicial Circuit, and Robert F. Moeller, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. General, and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Hector Manuel Irizarry appeals (1) his conviction for first-degree murder and sentence of death after a jury recommendation of life imprisonment and (2) his conviction *823 for attempted first-degree murder and sentence of thirty years imprisonment without parole for twenty-five years. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm appellant's convictions. For the first-degree murder conviction, we find a reasonable basis for the jury recommendation of life imprisonment and, therefore, direct the death sentence be reduced to life imprisonment without parole for twenty-five years. Further, we find that the sentence imposed for attempted first-degree murder was not statutorily authorized, and remand to the trial court for resentencing.
The appellant was convicted of first-degree murder of his former wife, Carmen Irizarry, and attempted first-degree murder of Carmen's lover, Orlando Hernandez. Appellant and Carmen were married in 1971. In 1980, they were divorced, but continued their cohabitation until June, 1984, when Carmen asked appellant to leave her Plant City house. During the following month, Orlando moved in with Carmen. The appellant told Carmen's daughter by a previous marriage that he did not want to leave Carmen, that he loved her, and that he could not understand why Carmen, a Puerto Rican like himself, would become involved with Hernandez, a Cuban.
Since 1981, the appellant had worked for an equipment company, performing odd jobs and occasionally using the company's machetes to cut brush. On the morning of July 25, 1984, about two weeks after Hernandez began living with Carmen, appellant's employer instructed him to take a truck owned by the employer's mother, to drive approximately fifty miles to a lake house, and to prepare the house for painting. Under the employer's plan, appellant was to spend the night at the lake house, and the employer was to join him the next morning. The employer assembled equipment for appellant's work and filled the truck with gasoline. Appellant left Plant City for the lake house around 9:30 a.m. Approximately one hour later, appellant called his employer from the lake house and told his employer that the water pump was not working. The employer directed the appellant to go to Clermont, the nearest town, and buy replacement fuses. Appellant did not call his employer again.
Appellant did call his stepdaughter that evening. Although she was not home, he left a message that she should call him at the lake house before 10:00 p.m. She did not return his call that evening.
Around 10:00 p.m. on the same evening, Hernandez went to bed at Carmen's house. He was awakened by a forcible blow to his face. He jumped from the bed and turned on a light. As the room became illuminated, he was struck in his back and fell to the floor. He touched the shoe of the assailant and saw the man running from the bedroom with a machete in his hand. Hernandez did not see the man's face, but observed that his attacker was a white man, bald on top and with little hair in back of his head. Hernandez's description of the assailant was not inconsistent with the appellant's features.
After the attacker fled, Hernandez saw Carmen lying on the floor. He touched her, but she did not respond. Hernandez then rushed to a neighbor's house and summoned aid.
The police found Carmen lying face down beside her bed. A trail of blood ran down the side of the bed. The medical examiner determined that Carmen had received five slash wounds from a sharp knife-like instrument. According to the examiner, the fatal injury was probably the four-inch wound across the front of the neck, extending through to the spinal column and producing near decapitation. Assuming Hernandez did not hear the victim scream, the examiner hypothesized that this blow to the neck was probably struck first.
A police inspection of Carmen's premises revealed that no property was stolen and that household possessions remained in their ordinary positions. The back door was unlocked. A window at the rear of the house had also been pried loose. Work gloves were discovered on the window ledge.
Early in the morning of July 26, the police notified Carmen's daughter. At *824 their request, she telephoned the appellant at approximately 5:30 a.m. and explained that her mother had been involved in an accident. Appellant went directly to Carmen's house, where he met a police sergeant outside the home. The police sergeant drove the appellant to the sheriff's operations center and, as they were driving, the sergeant noted specks of blood on appellant's face. Appellant told the sergeant that he had gone fishing at the lake house and that the blood probably came from the fish. Subsequent police analysis revealed the specks on appellant's forehead were human blood of an unidentifiable type and the specks around his nose were blood of an unidentifiable species.
When the police sergeant questioned him on July 26 and August 3, the appellant denied killing his former wife and maintained that he spent the night at the lake house. Although the sergeant did not tell him the type of wounds Carmen had received, appellant stated that he would have cut off his head before he would cut off hers, and that, if he had wanted to kill her, he would have cut her head off two weeks earlier. In the course of the interrogation, appellant agreed to take a polygraph examination.
On return of the truck, appellant's employer noticed that less than one-quarter of a tank of gas remained, which indicated use of more gas than should have been necessary to drive to the lake house, to Clermont, and return. As a test, the police filled the truck with gas in Plant City and drove to the lake house, then to Clermont, then to the lake house, then to Carmen's house, then to the lake house, then to Carmen's house, and finally to the employer's house. At the trip's end, less than one-quarter of a tank remained. When questioned about the amount of gas used, appellant stated that he had siphoned two gallons out of the trunk. The employer did find at the lake house a hose which smelled of gasoline.
The police never located the murder weapon, but they did obtain two machetes connected to the appellant: one from Carmen's bedroom and one from her daughter's home. The machete in Carmen's room was similar to those used by the employer, and appellant told his stepdaughter that he had given it to Carmen for her protection. Appellant left the other machete after cutting weeds in his stepdaughter's garden, approximately three weeks before Carmen's murder.
The stepdaughter testified that, while appellant was awaiting trial, she informed him that Hernandez was making a claim against Carmen's estate. She testified that appellant responded, "Maybe that is why he threw himself on the floor that way."
The jury found appellant guilty of the first-degree murder of Carmen and the attempted first-degree murder of Hernandez. During the penalty phase, appellant called witnesses to establish that he was dependable and a congenial worker and that he did not exhibit a quick or violent temper. Dr. Mussenden, a psychologist who interviewed appellant, testified that appellant's crimes were of passion. According to the psychologist, appellant was obsessed that his exwife had jilted him for a Cuban, thus causing him extreme emotional disturbance and impairing his capacity to appreciate the criminality of his conduct.
By a vote of nine to three, the jury recommended a life sentence. The trial judge overrode the jury recommendation and sentenced appellant to death. The trial court found four aggravating circumstances: (1) appellant had previously been convicted of a felony involving the use of violence to a person, i.e., the contemporaneous attempted murder of Hernandez;[1] (2) the capital felony was committed while appellant was engaged in burglary of a dwelling;[2] (3) the capital felony was committed in a cold, calculated, and premeditated manner;[3] and (4) the capital felony was especially *825 heinous, atrocious, or cruel.[4] The court found two mitigating circumstances: (1) appellant had no significant history of prior criminal activity, and (2) appellant had lived forty years with no significant prior criminal history.[5] With regard to the attempted murder of Hernandez, the trial court imposed a sentence of thirty years without parole for twenty-five years.

Guilt Phase
Appellant asserts five grounds for reversing his convictions. First, he contends the trial court erred in denying his motion for mistrial after a state witness mentioned on cross examination his polygraph test. Appellant did not contemporaneously object, and, although the trial court denied a delayed motion for mistrial, it gave a curative instruction. Under the circumstances in this record, we find no abuse of trial court discretion and no reversible error.
Second, appellant contends that the trial judge erred in allowing the state to admit in evidence the two machetes, neither of which was the murder weapon. The testimony established that appellant favored machetes as both tools and weapons. Under these circumstances, we find no error.
Third, appellant asserts that the trial court erred in denying motions for mistrial due to the prosecutor's remarks during closing argument. Appellant did not immediately object. Further, the trial court offered a curative jury instruction, but defense counsel declined. We find that, although the prosecutor's commentary was improper, the error was harmless in these circumstances.
Fourth, appellant argues that his convictions must be reversed because the bailiff conversed with the deliberating jury outside appellant's or his counsel's presence. This contention is meritless. The trial court dispatched the bailiff to communicate a bench directive, that the jury should reduce its questions to writing. The communication did not constitute an instruction on the law or a prohibited conversation with jurors.
Finally, appellant contends that the trial court erred in excluding a prospective juror opposed to capital punishment. This Court and the United States Supreme Court have disposed of this point, contrary to appellant's assertion. Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984); Dobbert v. State, 409 So.2d 1053 (Fla. 1982).
In conclusion, we hold that sufficient evidence supports appellant's convictions and that no reversible error exists in the trial's guilt phase.

Penalty Phase
Appellant raises multiple challenges to the propriety of his sentences. We find two issues dispositive.
With regard to his death sentence, we find that the trial court erred in overriding the jury's recommendation of life imprisonment because facts suggesting death as an appropriate penalty are not "so clear and convincing that virtually no reasonable person could differ," and that there was a reasonable basis for the jury's recommendation. Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). See Welty v. State, 402 So.2d 1159 (Fla. 1981); Barfield v. State, 402 So.2d 377 (Fla. 1981); Neary v. State, 384 So.2d 881 (Fla. 1980); Malloy v. State, 382 So.2d 1190 (Fla. 1979); McCaskill v. State, 344 So.2d 1276 (Fla. 1977). As stated in the trial court's findings, appellant lacked a criminal history, and evidence of nonstatutory mitigating factors could have influenced the jury to return a life recommendation. Furthermore, from evidence presented, the jury could have reasonably believed that appellant's crimes resulted from passionate obsession. In fact, the jury recommendation of life imprisonment is consistent with cases involving similar circumstances. See Ross v. State, 474 So.2d 1170 *826 (Fla. 1985); Herzog v. State, 439 So.2d 1372 (Fla. 1983); Blair v. State, 406 So.2d 1103 (Fla. 1981); Kampff v. State, 371 So.2d 1007 (Fla. 1979); Chambers v. State, 339 So.2d 204 (Fla. 1976).
With regard to the sentence for the attempted murder of Hernandez, we agree with appellant's contention that Florida Statutes do not authorize a twenty-five-year minimum mandatory sentence for attempted murder. See §§ 782.04(1)(a), 777.04(4)(a), 775.082(3)(b), Fla. Stat. (1983). We also find that the sentence of thirty years was an improper departure from the suggested guidelines sentence because some of the reasons for departure had been already factored in the guidelines scoresheet.
Accordingly, appellant's convictions for first-degree murder and attempted murder are affirmed. His death sentence is reduced to a life sentence without possibility of parole for twenty-five years for the first-degree murder, and the cause is remanded to the trial court for resentencing of appellant for the attempted first-degree murder.
It is so ordered.
McDONALD, C.J., and ADKINS, BOYD, OVERTON, EHRLICH, SHAW and BARKETT, JJ., concur.
NOTES
[1] § 921.141(5)(b), Fla. Stat. (1985).
[2] § 921.141(5)(d), Fla. Stat. (1985).
[3] § 921.141(5)(i), Fla. Stat. (1985)
[4] § 921.141(5)(h), Fla. Stat. (1985).
[5] § 921.141(6)(a), Fla. Stat. (1985).