547 So.2d 125 (1989)
John D. FREEMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 71756.
Supreme Court of Florida.
July 27, 1989.
*126 Michael E. Allen, Public Defender, and Paula S. Saunders, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
John D. Freeman appeals his conviction for first-degree felony murder, burglary with an assault, and robbery with a deadly weapon. The trial judge imposed the death sentence over a jury recommendation of life without possibility of parole for twenty-five years. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Freeman's convictions, but reverse his sentence of death, concluding that the jury had a reasonable basis to recommend imposition of the life sentence.
The victim, Alvin Epps, was found murdered in his home on October 20, 1986. The victim had died between 8:30 a.m. and 12:30 p.m. The residence had been entered through a rear bathroom window and had been ransacked. Certain personal items critical to this case were missing, including a camera, a Peugeot car radio, a fishing reel, clothing, an Indian blanket, jewelry, and pennies. Witnesses placed Freeman in possession of this property near the time of the murder. The woman living with Freeman testified that she saw Freeman with a gold bracelet and chain, new clothes, and an Indian blanket, which she knew he could not afford. Freeman gave the Indian blanket to his mother, and his girlfriend turned over the chain and bracelet to the investigating police detective. She testified that Freeman said he got the property from work release, in contradiction of his statement to police that he had received the items from Darryl McMillion.
Freeman's stepbrother's wife testified that Freeman came to her house at about 9:45 a.m. on October 20, 1986, the date of the murder, and that he had in his possession a bracelet and a camera. Later that night she saw a radio. Freeman also told her he got the jewelry and some clothes from work release. The record also establishes that Freeman gave a fishing reel to his father at about that same time in repayment of a debt. Freeman had told his father that he got the reel from someone at work.
Freeman's stepbrother testified that he lived a few houses away from Freeman, whose rent he was paying. He confirmed seeing the camera, radio, and fishing reel in Freeman's house and testified that they installed the radio in his car and took the fishing reel to their parents' house. The stepbrother was unsure on what day of the week the victim was killed. On redirect examination, the state brought out the fact that the stepbrother had given four sworn statements. In a proffer outside the presence of the jury, the stepbrother stated that his statements were made under pressure:
THE WITNESS: I wasn't going to sit there and tell you y'all was threatening me. And I believe that would have gave you a good chance to get me with something, if I sat there and telling you: you're threatening me.
After this exchange, the state successfully moved to have the stepbrother declared a hostile witness, and the stepbrother was led to reaffirm previous statements he *127 made that Freeman possessed the victim's property on the day the victim died.
Freeman's natural brother testified that, for unknown reasons, Freeman asked him to retrieve a large sum of money in a hidden bank bag. Freeman's girlfriend testified that Freeman did not want her to go to court and said his lawyer would "tear me apart in the courtroom." She also stated that Freeman offered her $24,000 to be delivered by his brother, which she could use to relocate to California where he would meet her.
Several of Freeman's statements were presented to the jury. In his first statement, Freeman acknowledged to the investigating detective that he knew the victim but had never been in the victim's house. When asked about his involvement in the crime, Freeman stated, "If you think I did it, prove it." In his second statement, Freeman was confronted with the fact that the detective had recovered the property from Freeman's family and girlfriend. Freeman stated that he bought the property from Darryl McMillion for twenty dollars. The state presented evidence to establish that McMillion was in Oklahoma during the month the murder occurred. After Freeman was incarcerated and charged with the second-degree murder of Epps[*] and the first-degree murder in another burglary/robbery of a victim named Collier, he attempted to escape by climbing through the roof of his holding cell in the county courthouse but was apprehended before he was able to leave the facility.
An expert in hair analysis testified that she compared two head hairs from the victim's clothing with head hair strands from Freeman and concluded that the hairs from the victim's clothing had the same microscopic characteristics as Freeman's hairs. She testified that, although her hair comparison was not a positive identification, it would be unusual to find two hair strands that are the same.
The medical examiner testified that the victim received six stab wounds  one in the neck, four in the chest, and one on the right thigh  and one small cut on the right ring finger. One chest wound and the injury to the thigh were superficial; two chest wounds were serious and would have caused death; and the wound to the neck, he believed, was the last inflicted and would have caused immediate paralysis but not unconsciousness.
In a special verdict form, the jury found Freeman guilty of felony murder, rejecting a finding of first-degree premeditated murder, and guilty of the other charged offenses.
In the penalty phase, the state presented evidence of a prior conviction for attempted burglary of a dwelling. In that incident, after a neighbor discovered him outside the house he was trying to burglarize, Freeman threatened the neighbor with a knife as he fled the scene. The state also presented detailed evidence describing the wounds inflicted upon the victim. Members of Freeman's family testified in his behalf about his difficult childhood and the beatings he received from his stepfather. A forensic psychologist testified that Freeman scored at the bottom of the adult normal range of intellectual ability, that his achievement test scored at the fourth grade level, and, that although he could distinguish right from wrong, he could not react quickly or think of alternatives in stressful situations. By a vote of nine-to-three, the jury recommended that the court impose a sentence of life imprisonment. The trial judge rejected the jury's recommendation and sentenced Freeman to death, finding three aggravating factors, specifically: (1) the murder was heinous, atrocious, and cruel; (2) this was a capital felony committed in the course of a burglary; and (3) Freeman had been previously convicted of a felony involving the use or threat of violence. The court found no statutory or nonstatutory mitigating circumstances. Freeman was also sentenced in accordance with the sentencing guidelines to concurrent terms of seventeen years for the other offenses.

Guilt Phase
Freeman raises seven claims of error in the guilt phase of his trial, specifically, that *128 the trial court erred in: (1) allowing introduction of evidence of Freeman's escape and instructing the jury on flight; (2) allowing introduction of evidence of money from an unrelated crime to demonstrate that Freeman attempted to bribe a witness; (3) declaring Freeman's brother a hostile witness and permitting the state to impeach him with prior inconsistent statements; (4) allowing the state to introduce the brother's prior inconsistent statements to bolster his credibility; (5) allowing a hair analysis expert to testify about certain scientific studies which did not form the basis for her opinion; (6) denying Freeman's motion for a new trial based on new and material evidence; and (7) denying Freeman's motion for a new trial based on the introduction of false evidence.
Freeman first argues it was error to allow evidence of his escape attempt. Freeman maintains that his actions, including fleeing the scene of the Collier murder, concealing himself, providing a false name upon apprehension, and later signing a written confession and being positively identified by a witness, support the motive for his flight due primarily to the other murder charge which carried a potential death penalty. He cites United States v. Myers, 550 F.2d 1036 (5th Cir.1977), and Merritt v. State, 523 So.2d 573 (Fla. 1988). We find neither Myers nor Merritt applies. Instead, we agree with the state that, at the time of his attempted escape, Freeman was incarcerated for both offenses and, while one might have carried a more serious penalty, at the time both were serious offenses and he attempted to elude prosecution for both. We conclude that evidence of flight is appropriate for both charges. See Bundy v. State, 471 So.2d 9 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986).
In his third and fourth points, Freeman argues that the trial court erred by declaring his stepbrother a hostile witness and by permitting the state to impeach him with prior inconsistent statements and bolster his testimony with prior consistent statements. On direct examination, the stepbrother stated that he made his earlier sworn statements under pressure by the state attorney's office and implied that his statements were not true. The trial judge became so concerned about the exchange between counsel and the witness that he suggested the witness should have the advice of independent counsel before proceeding since he faced possible perjury charges. We believe the record indicates that the stepbrother was being both difficult and recalcitrant in responding to inquiry. We find the trial judge did not abuse his discretion in declaring the stepbrother a hostile witness. This record reflects more than a mere lapse of memory and, consequently, our decision in Jackson v. State, 451 So.2d 458 (Fla. 1984), is inapplicable to these circumstances. Further, we find that the state, on redirect, did not improperly use the prior statements.
Points two and five are without merit and warrant no further discussion.
In his sixth and seventh points, Freeman contends he was entitled to a new trial because newly discovered evidence showed that Darryl McMillion could have been in Jacksonville, Florida, on the day the victim was murdered. Florida Rule of Criminal Procedure 3.600 sets forth the grounds for a new trial based on new and material evidence as follows:
(a) The court shall grant a new trial if any of the following grounds is established:
.....
(3) That new and material evidence, that if introduced at the trial would probably have changed the verdict or finding of the court, and that the defendant could not with reasonable diligence have discovered and produced upon the trial, has been discovered.
We find the trial judge acted within his discretionary authority in concluding that this proposed newly discovered evidence did not meet the test of probably affecting the verdict, given the record in this cause. See Booker v. State, 413 So.2d 756 (Fla. 1982); Perry v. State, 395 So.2d 170 (Fla. 1980); McCrae v. State, 395 So.2d 1145 (Fla. 1980), cert. denied, 454 U.S. 1041, 102 *129 S.Ct. 583, 70 L.Ed.2d 486 (1981); Baker v. State, 336 So.2d 364 (Fla. 1976).

Penalty Phase
The dispositive issue concerns the trial court's override of the jury's recommendation of life imprisonment. We agree with Freeman that both statutory and nonstatutory mitigating evidence existed which provided a reasonable basis for the jury's life recommendation. In finding Freeman guilty of first-degree murder, the jury expressly rejected a finding of first-degree premeditated murder and found him guilty of felony murder. Evidence was presented in mitigation that he was twenty-two years old at the time of the crime and was of dull-normal intelligence, scoring at approximately a fourth grade performance level. That, coupled with the psychologist's testimony and the history of abuse during Freeman's childhood, provides sufficient mitigating evidence to support the jury's recommendation. We have said numerous times before that if a reasonable basis exists for a jury's recommendation of life imprisonment, the trial judge should impose a life sentence. See, e.g., Hall v. State, 541 So.2d 1125 (Fla. 1989); Harmon v. State, 527 So.2d 182 (Fla. 1988); Perry v. State, 522 So.2d 817 (Fla. 1988); Ferry v. State, 507 So.2d 1373 (Fla. 1987). We conclude that no clear and convincing facts have been presented in this record to warrant imposition of the death penalty over this jury's recommendation of life imprisonment. Tedder v. State, 322 So.2d 908 (Fla. 1975).
Accordingly, we affirm Freeman's convictions and sentences for burglary with assault and robbery with a deadly weapon and his conviction for first-degree felony murder. We vacate his sentence of death and remand this cause to the trial judge for the imposition of a life sentence without the possibility of parole for twenty-five years and a determination of whether that sentence should be concurrent with or consecutive to the other sentences imposed.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[*] Freeman was subsequently indicted for the first-degree murder of Epps.