568 So.2d 908 (1990)
Steven Edward CHESHIRE, Appellant/Cross Appellee,
v.
STATE of Florida, Appellee/Cross Appellant.
No. 74477.
Supreme Court of Florida.
September 27, 1990.
*909 James B. Gibson, Public Defender, and Larry B. Henderson, Asst. Public Defender, Daytona Beach, for appellant/cross appellee.
Robert A. Butterworth, Atty. Gen., and Barbara C. Davis, Asst. Atty. Gen., Daytona Beach, for appellee/cross appellant.
*910 PER CURIAM.
Steven Edward Cheshire appeals from an order imposing a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In the early morning hours of October 30, 1988, residents of the Alhambra Trailer Park in Palatka heard a gunshot, a scream that lasted "just a few seconds," and another gunshot. One resident reported looking out his trailer and seeing nothing unusual. Another saw a bedroom light on in Darrell Durbin's trailer; also Durbin's front door was ajar.
When daylight came, neighbors reported seeing that cars parked in front of Durbin's trailer had flat tires, because they had been slashed. These neighbors called the police and reported the suspicious events they had witnessed. When a deputy arrived, he received no response from inside the trailer and entered through an unlatched door. There, he found the nude bodies of a man and a woman, both of whom had been shot and killed. The victims were Mary Cheshire and Darrell Durbin.
Police immediately suspected Steven Cheshire, the estranged husband of Mary. The night of the murders, a marked cruiser had seen Steven's car driving suspiciously not far from the trailer park.
Witnesses later testified that Cheshire had threatened to kill Mary if she ever left him. Some six weeks before the murders, Mary in fact had left her husband and told her sister that her husband had threatened to kill her. At this time, Mary moved in with Durbin.
One witness also testified that Cheshire had become extremely upset when he learned that his son had begun calling Durbin "daddy."
Steven Cheshire denied killing his wife. After his arrest, he called his former wife, Kathy Pappy, and told her he had had an argument with his girlfriend, Sharon Patria, on the night of the murders. Cheshire said he had gone to the Clock Restaurant, but decided not to stop. Later, said Cheshire, he went home around two o'clock.
Physical evidence of the murder was inconclusive. A phenolphthalein test indicated that at least one of seven stains found on a shirt worn by Cheshire was blood. Another expert testified that a shoe print found in Durbin's driveway "most probably" was made by Cheshire's right shoe, but could not tell when the track was made. A variety of shotgun shells were found at Cheshire's trailer, but none matched the shot that had killed Durbin.
Cheshire was tried on two counts of first degree murder and one count each of burglary, shooting into an occupied building and misdemeanor criminal mischief. The jury found Cheshire guilty as charged.
At the penalty phase, neither Cheshire nor the state presented any evidence. The jury then recommended life sentences by a vote of eleven to one for the murder of Durbin and ten to two for the murder of Mary Cheshire.
For the murder of Durbin, the trial court concurred in the jury recommendation and sentenced Cheshire to life. He also sentenced Cheshire to seven years for burglary, nine years for shooting into an occupied building and seven years for criminal mischief.
The trial court overrode the jury recommendation for the murder of Mary Cheshire, finding no mitigating factors and three aggravating factors. These three were prior conviction of a capital felony (the murder of Durbin), murder committed during a burglary, and heinous, atrocious and cruel.
As his first issue, Cheshire contends that the trial court's decision to override the jury recommendation of life imprisonment for the murder of Mary Cheshire was improper. The second issue is closely related: In it, Cheshire argues that the trial court erred by concluding that emotional disturbance was not a mitigating factor here because the disturbance failed to meet the statutory criterion of being "extreme." § 921.141(6)(b), Fla. Stat. (1987). We agree with both points.
The record before us contains ample mitigating evidence, improperly ignored *911 by the trial court, to support the jury's recommendation of life imprisonment. If facts are evident on the record upon which a reasonable juror could rely to recommend life imprisonment, then the trial court errs in overriding the life recommendation. Freeman v. State, 547 So.2d 125, 129 (Fla. 1989); Tedder v. State, 322 So.2d 908, 910 (Fla. 1975).
Indeed, the trial court's order below reflects some confusion as to exactly what constitutes a mitigating factor under applicable law. As we explained in Rogers v. State, 511 So.2d 526, 534 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988),
the trial court's first task in reaching its conclusions is to consider whether the facts alleged in mitigation are supported by the evidence. After the factual finding has been made, the court then must determine whether the established facts are of a kind capable of mitigating the defendant's punishment, i.e., factors that, in fairness or in the totality of the defendant's life or character may be considered as extenuating or reducing the degree of moral culpability for the crime committed. If such factors exist in the record at the time of sentencing, the sentencer must determine whether they are of sufficient weight to counterbalance the aggravating factors.

(Emphasis added.) The record before this Court discloses substantial mitigating evidence available to the jury, upon which the life recommendations reasonably could have been based. All of this evidence came from the state's own witnesses, since Cheshire exercised his privilege of presenting no case of his own.
First, based upon the state's case and the physical evidence, the murders at issue in this case reasonably could be characterized as the tragic result of a longstanding lovers' quarrel between Cheshire and his estranged wife. It is well established under Florida law that this type of situation constitutes valid mitigation. Fead v. State, 512 So.2d 176, 179 (Fla. 1987), receded from on other grounds, Pentecost v. State, 545 So.2d 861 (Fla. 1989); Irizarry v. State, 496 So.2d 822, 825 (Fla. 1986); Ross v. State, 474 So.2d 1170 (Fla. 1985); Blair v. State, 406 So.2d 1103 (Fla. 1981); Kampff v. State, 371 So.2d 1007 (Fla. 1979); Chambers v. State, 339 So.2d 204 (Fla. 1976).
Second, there was some evidence that Cheshire had been drinking at the time of the murder. Although the judge concluded that Cheshire was not sufficiently intoxicated, we nevertheless must acknowledge that a reasonable jury could have relied upon this evidence to conclude that Cheshire was not in control of his full faculties. There is no evidence whatsoever that Cheshire began drinking as a way of developing the "courage" to commit the murders. Thus, this is valid mitigation. Robinson v. State, 487 So.2d 1040, 1043 (Fla. 1986); Amazon v. State, 487 So.2d 8 (Fla.), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986).
Finally, the defense argues that the evidence is entirely consistent with a theory that Cheshire's acts were a crime of passion prompted in part by emotional distress over his pending divorce and the belief that his wife was encouraging their son to call Durbin "daddy." The state at oral argument conceded that this conclusion is consistent with the evidence, although the state also argued that the evidence is equally consistent with a motive of calculated revenge. Here again, the trial court agreed with the state and rejected this mitigation because the judge believed Cheshire later had "calmed down."
However, under Tedder, the trial court's role is solely to determine whether the evidence in the record was sufficient to form a basis upon which reasonable jurors could rely in recommending life imprisonment. As the state conceded at argument, the mitigating evidence cited by Cheshire is consistent with the evidence. Similar evidence also has been held to be valid mitigation in other analogous Florida cases.
Thus, it necessarily follows that a reasonable juror could have relied upon this evidence to conclude that Cheshire lost control of himself because of intoxication, a perceived affront to his family status and the emotional distress that accompanies a *912 failing marriage, and the fact that his spouse had left him for another person. Events that result in a person succumbing to the passions or frailties inherent in the human condition necessarily constitute valid mitigation under the Constitution and must be considered by the sentencing court. See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
In finding no valid mitigating factors, the trial court discussed some of the evidence we have noted above but rejected it out-of-hand without considering the reasonable-juror standard of Tedder. This misapplication of the Tedder standard resulted in an erroneous jury override that now must be reversed.
Moreover, in its written order, the trial court expressly concluded that this evidence did not support the statutory mitigating factor of "extreme" mental disturbance, because the disturbance here was not extreme. In addition, the trial court noted that it had considered "all other relevant testimony and argument as to statutory mitigating factors" (emphasis added). There is no mention of nonstatutory mitigating factors in the written order, although the trial court did mention and out-of-hand reject such factors in its oral statements at sentencing.
Florida's capital sentencing statute does in fact require that emotional disturbance be "extreme." However, it clearly would be unconstitutional for the state to restrict the trial court's consideration solely to "extreme" emotional disturbances. Under the case law, any emotional disturbance relevant to the crime must be considered and weighed by the sentencer, no matter what the statutes say. Lockett; Rogers. Any other rule would render Florida's death penalty statute unconstitutional. Lockett.
Moreover, under our decision in Rogers, the trial court is under an obligation to consider and weigh each and every mitigating factor apparent on the record, whether statutory or nonstatutory. Rogers, 511 So.2d at 534. The trial court may not constitutionally limit itself solely to considering statutory factors, as the court below apparently did in its written order. Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
We thus find double error in the trial court's sentencing order. First, the jury override plainly was improper. Second, the trial court clearly erred in confining its written order solely to the statutory mitigating factor of "extreme" emotional disturbance. Other nonstatutory mitigating factors were present and should have been considered.
As his third issue, Cheshire argues that the trial court improperly found the aggravating factor of heinous, atrocious or cruel. We agree. The factor of heinous, atrocious or cruel is proper only in torturous murders  those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. State v. Dixon, 283 So.2d 1 (Fla. 1973). The physical evidence simply does not support such a finding here. At best, we can only conjecture as to the exact events of the murder. Since the evidence at hand is entirely consistent with a quick murder committed in the heat of passion, we believe the state has failed to prove beyond a reasonable doubt that the factor of heinous, atrocious or cruel existed.
Fourth, Cheshire argues that the factor of heinous, atrocious or cruel is unconstitutional under Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Our opinion today renders this issue moot in the context of this case.
Fifth, Cheshire argues that his conviction cannot stand because the evidence against him is entirely circumstantial and the state failed to disprove every reasonable hypothesis consistent with his innocence. See Davis v. State, 90 So.2d 629, 631-32 (Fla. 1956). However, we believe there is substantial competent evidence upon which to conclude that Cheshire committed these murders. Statements of witnesses indicated that Cheshire previously had threatened his wife's life. Combined with the physical evidence, scant as it was, *913 this is sufficient to support the convictions here.
As his sixth issue, Cheshire alleges a variety of evidentiary errors by the trial court. First, he contends that the trial court improperly permitted a family member to identify in court the victims of the murder. We agree that this identification was needless and thus irrelevant, since there was no dispute as to the identities of the victims. However, after reviewing the entire record, we can only conclude that this error was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Next, Cheshire argues that the trial court erroneously permitted the state to introduce photographs showing the squalid conditions in which Cheshire lived. Again, we agree that this was improper, but find the error harmless. Id.
As his next evidentiary error, Cheshire alleges that the trial court improperly qualified a man named Allen Miller as an expert in blood-spatter evidence. It appears Miller's qualifications consisted of a single forty-hour course, three prior qualifications as an expert and his own field experience. While we agree that these qualifications are open to reasonable question, we nevertheless believe that the trial court did not abuse its discretion in allowing this expert testimony. Any deficiencies in an expert's qualifications, experience and testimony may be aired on cross-examination, provided there is some reasonable basis to qualify the expert. We believe such a basis existed on this record.
As his final evidentiary error, Cheshire argues that the trial court improperly permitted a witness, Robert Ursina, to compare his own experiences with his wife to Cheshire's experiences with Mary. We agree that this was error because the evidence was wholly irrelevant, but find it harmless. DiGuilio. We also reject Cheshire's argument that cumulative error has occurred.
In his seventh issue, Cheshire argues that the trial court erroneously sentenced him for felony criminal mischief when he was charged only with a misdemeanor. Since the state concedes the error, we have no choice but to remand for a proper sentence under the misdemeanor statute.
As his eighth issue, Cheshire argues that Florida's death penalty scheme is arbitrary and capricious. We find no merit in this argument. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
Finally, the state has filed a cross appeal in which it alleges that the trial court erroneously departed downward from the sentencing guidelines without written reasons when it imposed a seven-year sentence upon Cheshire for burglary. The sentence actually should have been in the nine- to twelve-year range. Cheshire concedes the error but argues that double jeopardy prohibitions forbid Florida from sentencing him to a greater sentence on remand.
We disagree with Cheshire. In this instance, the trial court must recompute the guidelines scoresheet because of errors noted previously in this opinion. We find nothing in North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), or our own case law that restricts the trial court on remand to its original error in the burglary sentencing. See Roberts v. State, 547 So.2d 129 (Fla. 1989); State v. Chaplin, 490 So.2d 52 (Fla. 1986). Double jeopardy does not guarantee a defendant the benefit of a judge's good-faith mathematical or clerical errors. However, because of our own case law under the sentencing guidelines, we believe that the trial court now must resentence Cheshire within the recommended guidelines range. No further departure will be permitted. Pope v. State, 561 So.2d 554 (Fla. 1990).
For the foregoing reasons, we affirm Cheshire's conviction, quash the death penalty and remand with directions that the trial court impose a life sentence without possibility of parole for twenty-five years.
It is so ordered.
SHAW, C.J., and OVERTON, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
McDONALD, J., concurs with an opinion.
*914 McDONALD, Justice, concurring.
I concur on guilt and comment on the penalty. In order to sustain a sentence of death when a jury recommends life the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ. Tedder v. State, 322 So.2d 908 (Fla. 1975). This is a stern test.
The existence of one or more mitigating factors does not necessarily preclude a jury override. The sentencing judge must look at the totality of the aggravating and mitigating circumstances to determine whether the jurors' recommendation was reasonable. The existence of discernible mitigating circumstances is strong evidence that it was. There are some cases, however, where the aggravating circumstances are so overwhelming that it is unreasonable to recommend life even when there are one or more mitigating factors. The test to be applied by the judge is whether the facts are such that the jury's recommendation is reasonable and not whether the judge would reach the same conclusion. The benefit of any doubt on the reasonableness of a recommendation of life must be given the defendant.
It cannot be said in this case that the facts suggesting death are so clear and convincing that virtually no reasonable person could differ. I therefore agree that the sentence of death must be vacated.