808 So.2d 110 (2001)
Carlton A. FRANCIS, Appellant,
v.
STATE of Florida, Appellee.
No. SC94385.
Supreme Court of Florida.
December 20, 2001.
Rehearing Denied February 11, 2002.
*115 Peter Grable, West Palm Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Carlton Anthony Francis. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons detailed below, we affirm Francis' convictions and death sentences.

FACTS
On July 24, 1997, Claire Brunt and Bernice Flegel, 66-year-old twin sisters, were found dead with multiple stab wounds in their West Palm Beach home. Both women were widows and had lived together since 1983.
*116 The defendant, Carlton Francis, 22 years old at the time of the events, lived next door to the victims with his mother, Eleanor Goods. The defendant's 8-year-old nephew, R.G., his 14-year-old nephew, G.G., and his elderly aunt also lived in the house with Francis and his mother. Mrs. Goods and the deceased twin sisters were good friends who would frequently go to garage sales together. In addition, Mrs. Flegel and Mrs. Brunt would often provide Francis rides to school or to pay bills. They would also permit him to change the oil in their 1980's tan Pontiac Grand Prix.
Susan Wood, Mrs. Brunt's adult daughter, testified that she remembered being at her mother's house on one occasion when Francis approached the house, and looked through the vertical blinds draping the front window. Susan explained that Francis studied the inside of the house for a few minutes and finally proceeded to the door. She remembered that he engaged in similar behavior on another occasion.
The evidence introduced at trial established that between 11 a.m. and 12 p.m. on the day the bodies of the twin sisters were discovered, Susan telephoned her mother to inquire whether she and her aunt would be home between 3 p.m. and 4 p.m. that day because Susan had planned to visit.
Earlier that morning, the neighboring children, R.G. and G.G., were swimming in the pool located in Francis' backyard and observed Mrs. Brunt, in her backyard, who waved to the children. The defendant walked out of the house and into the pool area carrying a green duffle bag on his shoulder. R.G. observed what he described as a silver pipe sticking out of the bag. Francis told the children that he was going to play basketball and he then reentered the house.
Later, after the swimming activity had ended, R.G. went to the front yard to ride his bicycle. While riding his bike, he saw Mrs. Flegel walk out to her front yard and retrieve a newspaper from a recycling bin. Thereafter, while riding his bike, R.G. saw Francis leave his home through the front door wearing a white T-shirt and blue shorts and carrying the green duffle bag that R.G. had seen him with earlier. The young boy noticed a dark red spot on Francis' T-shirt near the shoulder as he watched his uncle walk away in the direction of the victim's home. Later that day, the defendant called R.G. and asked him if he had seen what was inside the green duffle bag. R.G. responded that he had not. R.G. was still out riding his bike when he saw Susan and her son arrive at the victims' home.
Mrs. Brunt's adult daughter and eight-year old grandson arrived at the home of the deceased twins between 3 p.m. and 4 p.m. When she arrived, she realized the car that the victims shared was not parked in the carport as was usually the case. As she reached the front door, she realized that the door was ajar. When she walked in, she noticed her mother sitting in a chair immediately next to the front door with her back facing the door. Once she approached her mother, she realized that her mother's necklace was wrapped tightly around her neck and that blood was dripping from her neck; she was not breathing. Susan turned to walk toward the phone to call for help and then noticed her aunt lying face down in the kitchen in a pool of blood. She called the police, who arrived shortly after 4 p.m.
In a back bedroom of the home, police found a metal box that had been forcibly opened. According to Kerry Cutting, Mrs. Flegel's adult daughter, her mother had been in possession of this metal box for many years. Inside the box, Mrs. Flegel had kept insurance papers, a passport, turn-of-the-century coins and two gold pocket watches, one with an elaborate *117 scroll pattern on the outside. The box was empty with the exception of a small case containing a ring band. Other missing items included a heart-shaped locket; at least one gold chain; and a small black radio. No large items were missing from the home.
Charles Hicks, Jr., also known as C.J., lived approximately four miles from the victims with his wife Sally and several nieces and nephews.[1] C.J. met Francis approximately one year prior to these July 1997 events when Francis had paid him to change a tire on his car. Although C.J. worked as a mechanic and in construction at times, he was also involved with drugs. C.J. testified that he had sold Francis heroin on as many as ten different occasions. According to Sally's testimony, C.J. had been in the house with her the entire morning and early afternoon of July 24, 1997.
At approximately 3:40 p.m. on that date, C.J. saw Francis exit a vehicle he described as a 1980's brown or beige Pontiac Grand Prix. Francis parked the car in the alley behind the church and was carrying a green duffle bag over his shoulder. C.J. also saw Francis holding a pair of what appeared to him to be gardening gloves. Francis walked over to C.J.'s house, entered the house, sat on the couch with Sally, and watched television. While he was watching television, a news bulletin was broadcast concerning the discovery of the bodies of the twin sisters. According to Sally's testimony, Francis just stared at the television set and did not have any reaction. Although the record is not clear as to whether Francis bought heroin immediately upon arriving at C.J.'s house, it is clear that Francis bought $10 worth of heroin from C.J. that afternoon.
After the news bulletin appeared, Francis asked C.J. to lend him a wheelbarrow and gasoline. Francis was seen placing "some stuff" in the wheelbarrow and attempting to burn it. One of the items C.J. observed in the fire was a ladies' white pocketbook, containing $22 or $23. Something that appeared to be a passport was also in the wheelbarrow along with articles of clothing, as well as the green duffle bag C.J. had seen Francis carrying when he exited the Pontiac. After attempting to burn the items, Francis was seen dumping the remaining contents of the wheelbarrow in a trash pile across the street from C.J.'s house.
During that same afternoon, C.J. saw Francis holding car keys with a leather strap attached to the key chain. Mrs. Flegel's daughter testified that her mother's key chain was a leather strap with a block letter "B" on it. The keys to the victims' car were found within the pile of burned debris. The vehicle in which Francis had arrived was found only a couple of blocks away.
Shortly before 7 p.m., Francis walked up to the cab stand on Tamarind Avenue to summon a ride.[2] A taxi driver testified that he transported Francis back to his neighborhood and Francis exited the taxi at the corner near his house because police cars were blocking the area.
Detective Wills, who was directing the early stages of the investigation, saw Francis arrive at approximately 7:25 p.m. Francis walked straight ahead and then turned and walked up his driveway and directly into the front door of his home. *118 Both Detective Wills and Susan Wood's husband testified that the defendant never turned to look over to the victims' home where crime-scene tape still surrounded the area. At this time, Francis was wearing a light blue Orlando Magic tank top, blue faded denim shorts, and white Reebok sneakers.
Detective Wills walked over to Francis' house and was invited in by the defendant's mother. Detective Wills extended his hand to shake hands with Francis but Francis looked startled and swayed back. Detective Wills explained that he was investigating the murder of Francis' next door neighbors. The defendant stated that he already knew about it because he had seen the news bulletin on television. Detective Wills then advised, "I understand you were home earlier," and Francis inquired how the detective knew that information. When Wills answered that Mrs. Goods had mentioned it, Francis turned to his mother and said, "Mama, why did you tell him that?" Detective Wills then asked Francis where he went after leaving his house, to which Francis responded that he had gone to his friend Ghandi's house. Detective Wills inquired further as to where Ghandi lived and Francis responded that Ghandi lived in the neighborhood. Francis provided no details as to who Ghandi was or exactly where he lived. Francis then stated that he did not want to be the next victim and that he did not want to become involved; he proceeded to walk away leaving Detective Wills standing in the middle of the living room.
The detective left Francis' home and approximately one-half hour later he observed Francis walking out of his house carrying three garbage bags. Detective Wills inquired as to where Francis was going, to which Francis responded that he was going to leave for safety reasons. A few seconds later he added that his mother had thrown him out of the house.[3] While Francis was standing outside his home, Detective Wills asked Francis if the clothes he was then wearing were the same clothes he had been wearing when he left the house in the morning, to which Francis responded affirmatively. Francis' mother, who was standing nearby, interjected and said, "Don't you lie. You weren't wearing those clothes earlier. You told me you got those from a friend." Francis then related that he had obtained the clothes from his friend Ghandi. When Detective Wills asked Francis where the clothes he had been wearing earlier were located, Francis began looking through the plastic garbage bags, pulled out a pair of checkered shorts and said that he had been wearing them earlier. His mother again broke into the conversation and said, "Don't lie. I saw those shorts on the bathroom floor." Francis then responded that he had not been wearing the checkered shorts earlier and that he guessed that the clothes he was wearing earlier in the day were at Ghandi's house. Detective Wills also questioned whether the Reebok shoes that Francis was wearing at the time were the same shoes he had been wearing earlier. Before he could answer, Francis' mother said, "You told me you got those from your friend, too." Francis replied that he had obtained the shoes from a friend and that his sneakers were with his clothes at Ghandi's house. Detective Wills pressed Francis for more details as to where Ghandi lived, but Francis again only responded that Ghandi lived in the neighborhood and that he did not know the house or the address. At that time, a taxi *119 arrived and Francis entered it and left. Francis was transported to a location near C.J.'s house, and that night he began sleeping in the abandoned shack next to C.J.'s house. Ghandi was never located.
While Francis was basically living in the abandoned shack, he visited with C.J. and showed him some old coins and two pocket watches, one with an engraved pattern. Francis requested that C.J. pawn the items for him, but C.J. declined, claiming that the items were not worth much. Francis also attempted to trade these items to C.J. for an assault rifle, but C.J. did not think the items were worth the trade.[4] Instead, C.J. introduced Francis to a gun dealer named Bruce Brown, who testified that Francis wanted to purchase an assault weapon. Francis told Brown that he had the money, but that he could not get to it right away.
C.J. admitted retaining the coins, watches, and a necklace and showing them to Sally. Both C.J. and his wife testified that during the course of several days, the items were exchanged back and forth between C.J. and Sally and Francis, at Francis' demand. C.J. was the last to have possession of the coins and watches. In addition to the coins and jewelry, Francis also showed C.J. a small black radio. Francis also wanted to sell the radio, but it was not worth much. Eventually, Francis discarded the radio.
George Dean, who had known Francis for several years, testified that Francis approached him while he was having dinner at a local restaurant and asked if he wanted to buy a necklace. Dean responded that he was not interested because it looked like a necklace that an "old person would wear." The necklace had a long chain and an attached locket.
C.J. testified that when he learned that Francis may have been involved in events more serious than a purse snatching, he contacted the police. C.J. informed officers that he had information concerning the person who was possibly responsible for the murders of the twin sisters. When asked how he had obtained the information, C.J. replied that he had seen Francis exit the victims' car on the day of the murders and that he had in his possession some of the items stolen from the victims' home. C.J. left the police headquarters for about 10 to 15 minutes and returned with the coins and the pocket watches. C.J. led officers back to his house and to the abandoned shack.
The first item recovered by the investigators was a .22 caliber Winchester rifle which had been partially buried in the sand between the church and day care center and the abandoned shack.[5] The rifle belonged to C.J., who kept it, along with bullets, in the abandoned shack, which remained unlocked.
Also in the same area, the investigators found a pair of latex gloves on top of the church's air conditioning unit. In a small, wooden shed located in the same area,[6] investigators recovered a second pair of rubber gloves and a baseball cap inside of which were fourteen loose live rounds, a box of ammunition containing fifty-five *120 rounds of .22 caliber ammunition, and a couple of pennies. At trial, R.G. testified that his grandmother, a nurse, kept a box of rubber gloves in the house where Francis resided. A small black radio was also recovered in a nearby area.
The investigators then searched the 25 foot long mass of debris across the street from C.J.'s house. At the end of that pile of debris was a deposit of ashes and burnt items. In that deposit, the investigators recovered: two sets of keys, which were from the victims' vehicle; the metal frame of a pocket purse with a snap latch;[7] buttons; some burnt cloth; an eyeglass arm; a lighter; a padlock; a polaroid photo of Sally, the corner of which appeared to have been burned, but not to any great extent; and papers showing some degree of fire damage.
The investigation then moved on to the abandoned shack where officers found more .22 caliber ammunition and a bible. The bible had Francis' fingerprint on it. Francis was arrested later that afternoon and shortly thereafter Mrs. Flegel's daughter arrived at the police department and identified the items recovered during the investigation as those belonging to her mother and aunt.
Detective Key became involved with the case on the day of the arrest and after reading Francis his Miranda rights, he and Detective Wills began to interrogate Francis. According to the detectives' testimony, Francis mentioned touching coins, watches, a rifle and a radio without those items first being mentioned to him. After approximately fifteen minutes into the interrogation, Francis said he wanted to speak to a lawyer. The interrogation ceased with Francis remaining in the interrogation room for approximately three and one half hours. At around 8:30 p.m., Francis knocked on the door of the interrogation room. Detective Key came to the door and inquired as to what Francis wanted, to which Francis replied that he wanted to talk to them. Approximately one half hour after Francis knocked on the door, the detectives returned to the interrogation room with him. At this time, a hidden recording device inside the interrogation room was activated.
When asked what he had been doing the morning of the murders, Francis responded that he had awakened at around 11 a.m. and that he sat around the house until approximately 2 p.m. when he left. He was then interrogated concerning the clothes he was wearing on the day of the murders and his mother's statement: "Don't you lie. You weren't wearing those clothes earlier." Francis responded that when his mother saw him that morning (when she came home for lunch) he had just awakened and was wearing different clothes from those he was wearing when he actually left the house (i.e., his mother never saw the clothes he was wearing when he left the house). He further claimed that he did not walk in the direction of the victim's home, as his nephew testified. He again reiterated that he went to see his friend Ghandi, and then added that Ghandi's house was on Robbins Street. He told the officers that Ghandi was not home so he went to play basketball at a park around the Westgate area. He stated that after he finished playing basketball, he was transported back to his home in a taxi because he did not feel like walking. At that time, the detectives advised him that they knew he had not entered a taxi by Westgate, but that they knew he summoned a cab at the taxi stand on Tamarind Avenue. Francis then explained that he had been in the area by Tamarind Avenue and admitted that the *121 taxi ride had commenced at the Tamarind cab stand.[8]
The investigation conducted at the home where the bodies were found resulted in the recovery of a spent .22 caliber casing. According to a firearms expert, this spent casing had been fired from the .22 Winchester rifle which had been found in the abandoned shack located next to C.J.'s house. The expert added that there was no way of ascertaining when the casing had been actually fired or ejected. Further investigation of the crime scene revealed that there was no evidence of a bullet strike anywhere in the house, and the medical examiner further testified that neither victim had a bullet wound.
The investigators also recovered several shoe prints from inside the victims' home. A shoe print expert testified that one of the prints was consistent with the shoes Mrs. Flegel was wearing at the time her body was discovered and the other prints were consistent with a Nike model sneaker, ranging in size from eight to ten. Although Francis' shoe size was a size eleven, he was wearing size nine and one-half Reebok sneakers at the time of his arrest.
The investigators also recovered three knives which were lying out of place. The first was located on a table by the front door and next to Mrs. Brunt. A second knife was found on a wicker stool which was usually in the kitchen, but was in the living room when Mrs. Brunt's daughter arrived. A third knife was found on the kitchen counter. A portion of the handle of the knife found on the kitchen counter had broken off and was found in the pool of blood on the floor where Mrs. Flegel was found. The knife recovered from the table by the front door had blood residue, as did the knife found on the wicker stool. The knife on the kitchen counter top (with the broken handle) had no traces of blood.[9] One knife (the testimony does not indicate which one) had Mrs. Brunt's blood on it; the other had traces of Mrs. Flegel's blood.
A DNA technician also tested swabs containing blood from the floor, from under the bar stool found in the living room, from a wall, and from the garbage can in the kitchen. All of the blood samples collected were consistent with that of the victims. None of the samples collected matched either Francis or C.J.
The medical examiner's report indicated that Claire Brunt received sixteen stab wounds, including one which severed her jugular vein and two in her back, which were three to four inches deep and punctured her lung. Mrs. Brunt had one defensive wound just above her wrist. Dr. Sibert testified that she was conscious for a period from a few seconds to a few minutes. Bernice Flegel was stabbed twenty-three times. The deepest of her wounds reached four to five inches into her liver; her jugular vein was also severed. Mrs. Flegel had no defensive wounds.
After an eight-day trial, the jury returned a verdict of guilty on two counts of first-degree murder; two counts of robbery with a deadly weapon; one count of burglary with assault or battery; two counts of aggravated battery on a person sixty-five or older;[10] and one count of grand theft. Following the penalty phase, *122 the jury recommended,[11] and the trial court imposed, the death penalty for both counts of first-degree murder.[12] The trial court also sentenced Francis to a five-year term of imprisonment for the grand theft conviction and, based on an upward departure from the sentencing guidelines, to three life sentences for the one burglary count and the two robbery with deadly weapon counts, all sentences to run concurrently.

ANALYSIS
Francis raises sixteen claims of error.[13] We will address each in turn.

Peremptory Challenge
As his first claim on appeal, Francis argues that the trial court erred in denying his objection to the State's peremptory challenge of an African American juror. In Melbourne v. State, 679 So.2d 759 (Fla.1996), this Court refined the appropriate *123 procedure to be followed when a party objects to the exercise of a peremptory challenge on racial grounds:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially racially neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step three is not on the reasonableness of the explanation, but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.
Voir dire proceedings are extraordinarily rich in diversity and no rigid set of rules will work in every case. Accordingly, reviewing courts should keep in mind two principles when enforcing the above guidelines. First, peremptories are presumed to be exercised in a nondiscriminatory manner. Second, the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous.
Id. at 764-65 (footnotes omitted).
The record in this case demonstrates that the prosecutor asked prospective juror Bennett, "How did you feel when you first came into this courtroom and you heard the judge tell you that a young man is accused of killing two people? What is the first thing you thought?" Ms. Bennett answered, "Nothing.... Nothing at all."
Shortly thereafter, the State peremptorily challenged Ms. Bennett. The following then transpired:
[Defense:] We object to Ms. Bennett. She's one of only two African Americans. She said nothing that is even remotely prejudicial in this case, and we would ask for a race neutral reason for the striking of one of our rare African American jurors.
[COURT:] Mr. Shiner.
[State:] The reason that the State has used the peremptory, when it was mentioned that two people were killed, it was noted that she laughed.
[Defense:] Your Honor, that is something we never saw. And it certainly isn't noted on the record, and Mr. Shiner didn't ask for it to be noted on the record, and we object.
[COURT:] I will accept that as a race-neutral reason and the peremptory is granted as to Ms. Bennett.
Because steps 1 and 2, as set forth in Melbourne, were satisfied, the issue becomes whether the court correctly determined that the explanation provided was not pretextual (i.e., step 3). More specifically, the issue is whether such a determination may be made when there is no on-the-record basis for the challenge.
Recently, in Georges v. State, 723 So.2d 399 (Fla. 4th DCA 1999), the district court addressed a situation where the State peremptorily challenged an African American juror on the basis that she nodded in affirmation to the question of whether anyone had been fired from a job without knowing the reason for the termination. This question was presumably propounded because Georges had been fired from his *124 job as a result of the incidents that gave rise to that particular prosecution. The Fourth District affirmed the trial court's determination that the reason was not pre-textual even though there was no on-the-record response from the juror. See id. at 399. The court reasoned that "[g]iven the trial court's superior vantage point, there is no reason to set aside the determination that the State's reason for the challenge was non-pretextual and genuine." Id.
While the transcript does not explicitly indicate that Ms. Bennett laughed, it does indicate that she thought "nothing at all" about the accusation that an individual had killed two people. Given her light-hearted response to such a serious question, it is understandable that the trial court would be particularly attuned to the surrounding circumstances.
Moreover, considering that the focus of step 3 is the genuineness of the race-neutral explanation offered by the State, it is important to note that when asked a question similar to that presented to juror Bennett, others responded quite differently. For instance, one of the other jurors indicated: "I'll tell you, yesterday when I walked in and the judge said that it was a criminal case, the first thing I thought about was this is serious, and I based that answer in [sic] the fact that there is a life at stake." With responses such as that quoted above, the trial judge appropriately considered the prospective juror's demeanor and determined that the prosecutor was genuinely concerned about a juror who expressed such a nonchalant attitude about a double murder. Because the focus of the proper inquiry is the genuiness of the explanation, and because a trial court's decision in this matter is not to be disturbed unless it is clearly erroneous, see, e.g., Rodriguez v. State, 753 So.2d 29, 40 (Fla. 2000), we find no reversible error.

Motion to Suppress
Francis next asserts that the trial court erred in denying his motion to suppress the evidence gathered and the statements made shortly after his arrest based on lack of probable cause.
In Walker v. State, 707 So.2d 300, 312 (Fla.1997) we stated:
Probable cause for arrest exists where an officer "has reasonable grounds to believe that the suspect has committed a felony. The standard of conclusiveness and probability is less than that required to support a conviction." Blanco v. State, 452 So.2d 520, 523 (Fla.1984). The question of probable cause is viewed from the perspective of a police officer with specialized training and takes into account the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Schmitt v. State, 563 So.2d 1095, 1098 (Fla. 4th DCA 1990).
Moreover, when reviewing a trial court's determination of historical facts as occurred here in connection with the motion to suppress, we look to all of the surrounding facts and circumstances in the light most favorable to sustaining the lower court's factual conclusions. See Cole v. State, 701 So.2d 845, 855 (Fla.1997).
The facts known to police at the time of Francis' arrest were described by Detective Wills at the hearing on the motion to suppress. Specifically, at the time of the arrest, police knew that two gold pocket watches, some old coins, jewelry items, and a 1980's tan Pontiac Grand Prix had been stolen from the victims' home. They also knew that Francis lived next door to the victims; was home shortly before the murders occurred; left his house carrying a green duffel bag; and walked in the direction of the victim's home. They knew that later that afternoon Francis exited a car matching the description of the victims' *125 car while carrying a green duffel bag. They knew that on that same afternoon he attempted to burn some clothing, the green duffle bag, and a ladies' pocketbook. They knew that he later summoned a taxi three blocks from where the victims' car was recovered. They knew that, upon his return to his house that same night, he walked past the victims' house, where police and media were still gathered, without even glancing in that direction. They knew that Francis could not provide an address or a general direction as to where he had been from mid-morning through the afternoon on the date of the murders. They knew that he repeatedly wavered when asked what clothing he had been wearing earlier that day, and finally, police knew that Francis had subsequently shown C.J. two gold pocket watches, some old coins, and a necklace for C.J. to pawn. These facts clearly support the trial court's finding that police had probable cause to arrest the defendant. See, e.g., Walker v. State, 707 So.2d 300 (Fla.1997) (finding defendant's inconsistent statements to police regarding his activities around the time of the murders, inter alia, sufficient to establish probable cause to arrest); Carroll v. State, 497 So.2d 253 (Fla. 3d DCA 1985) (determining that officers had probable cause where the defendant's roommate informed police, inter alia, that the defendant left the house in a car matching the description of the car that had just been stolen from the victim's home). Thus, we conclude that the trial court did not err in denying Francis' motion to suppress.

Reinitiation of Contact After Invoking Right to Counsel
Francis also argues that the trial court erred in concluding that he had reinitiated contact with detectives after he had invoked his right to an attorney. We begin by noting that pursuant to Walker v. State, 707 So.2d 300, 311 (Fla.1997), the trial court's ruling with regard to the factual circumstances is accorded great deference.
At the hearing on the motion to suppress, Detective Wills testified that following Francis' 4:25 p.m. arrest in the alleyway, he was transported to the police department and at 4:50 p.m. received proper Miranda warnings. Although Francis refused to sign the rights waiver card, he agreed to speak to the officers. Francis admitted touching some old coins, one gold watch, and some bullets. When police pressed for more information, Francis invoked his right to counsel. The interrogation immediately ceased, and the police left the room. This questioning lasted for approximately ten to fifteen minutes.
Although Detectives Key and Wills had terminated all conversation with Francis, he remained in the interview room as they completed further work on the case. Wills testified that he was doing paperwork on the case while other officers had been dispatched to the shack next to C.J.'s house and the surrounding area. As officers found items, such as the car keys for the victims' car, the findings were relayed to Wills. At 6 p.m., Mrs. Flegel's daughter, Kerry Cutting, came to the police department and identified the items disclosed to the authorities by C.J. as those which were stolen from her deceased mother's home.
The next police contact with Francis occurred at approximately 8:30 p.m. when Francis summoned the officers with a knock on the door of the interview room. According to Wills, he opened the door and asked Francis what he wanted. Francis specifically advised him that he wanted to talk to the police officers again. Wills informed Francis that because he had requested an attorney, the officers could not speak with him further. Francis replied that he wanted to talk about the case and that he no longer wanted a lawyer. *126 Wills told Francis that he would consider the matter and return to him. Wills then discussed the parameters of what could and should be done with Detective Key. The officers mutually decided to talk further with Francis and to record the conversation. There were no other conversations between Francis and the police between 8:30 p.m. and 9:07 p.m. when the taped conversation began.
The twenty-five-minute long recording of the discussion was played during the hearing on the motion to suppress. The tape began with Detective Key stating the time to be 9:07 p.m. and asking Francis if he remembered knocking on the door at about 8:30 p.m. Francis responded that he did knock on the door. The following then transpired:
Key: Why did you knock on the door?
Francis: Well, I wanted to talk and find out
Key: What's going on?
Francis: Yes.
Key: So you initiated the contact with us?
Francis: Huh?
Key: Youwhat I mean is you initiated the contact with us?
Francis: Well, you see, I mean, from the way you made it seem earlier, it's like I mean, I thought the reason why theyyou were gonna arrest me or have me arrested was because you felt that I lied to you about something. You told me that I lied.
Key: Well, what we are doing is a police investigation, and we found out certain factors.
Francis: Yes.
Key: And the main thing I'm concerned with, did you contact us or we contacted you? You called us, right?
Francis: I knocked on the door.
Key: Okay. `cause you had told us earlier you wanted to see a lawyer, right?
Francis: Yes.
Key: And weand when you say that, I can't just come up here and start talking because I left you in the room and was over there minding my own business and you knocked on the door, and I came to the door and I says, well, you realize, Carlton, you asked to see a lawyer so I can't talk to you anymore, but you said "I want to talk to you," is that right?
Francis: Yes.
Key: You said that, okay? When you said that
Francis: `cause I wanted to speak to you.
Key: When you said you wanted to speak to me, we came in here and we started talking
Francis: Yes.
The law is well-settled that once an accused has invoked his right to counsel any interrogation must immediately cease until counsel is made available, unless the accused himself initiates further communications with the police. See Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). With that in mind, Francis argues that his knock on the door and his admission, on tape, that he knocked on the door because he wanted to find out what was going on, did not constitute initiation of contact with the police under the Edwards rationale. Francis specifically contends that any contact initiated by him was merely perfunctory in nature.
This issue has been decided adversely to Francis' position by the United States Supreme Court in Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Bradshaw was arrested and Miranda rights were read. Bradshaw informed *127 officers that he wished to speak with a lawyer. The officers immediately terminated the conversation. On the way to the county jail, Bradshaw inquired of one of the officers, "Well, what is going to happen to me now?" The officer responded, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say-because-since you have requested an attorney, you know, it has to be at your own free will." Bradshaw said he understood. As a result of the conversation that ensued, Bradshaw agreed to take a polygraph and later confessed. The Court concluded:
There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in Edwards.

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officers as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that "[y]ou do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized investigation. On these facts we believe that there was no violation of the Edwards rule.
Id. at 1045-46, 103 S.Ct. 2830 (plurality opinion) (citations omitted).
Here, Francis' acknowledgment during the taped statement that he knocked on the door because he wanted to find out what was going on is nearly identical to Bradshaw's question to the police. Moreover, as in Bradshaw, the police in this case applied the additional precaution of informing the defendant that because he had invoked his right to counsel, they could not speak with him unless Francis indicated that he wished to reinitiate contact. Francis agreed that he did in fact initiate contact and that he wanted to speak further with the officers. As a result, we find no Edwards error. See, e.g., Stein v. State. 632 So.2d 1361, 1364 (Fla. 1994) (finding that defendant reinitiated contact when he knocked on the door and stated "I want to talk about part of it").
Relatedly, Francis argues that having him remain in the interrogation room for three and one half hours was a psychological ploy designed to make him provide a statement. This tactic, as the argument flows, made the resulting taped statement involuntary. Francis relies on Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in support of this argument. In Innis, the defendant, who *128 had been advised of his Miranda rights, invoked the right to speak with an attorney. While en route to the station, the officers in the car began a conversation relating to a missing shotgun. One of the officers stated, "God forbid one of [the handicapped children who were nearby] might find a weapon with shells and they might hurt themselves." The defendant interrupted the conversation and agreed to show them where he had hidden the shotgun. The broad holding of the Court was that words or actions designed to elicit an incriminating response constitute the functional equivalent of interrogation, for Miranda purposes. See id. at 301, 100 S.Ct. 1682. With regard to the Innis case, the Court determined that the conversation between the two officers was not designed to elicit a response. See id. at 302, 100 S.Ct. 1682.
It is important to mention that whether a statement is voluntary will depend on the totality of the circumstances surrounding the statement. See Sliney v. State, 699 So.2d 662, 667 (Fla.1997). Nothing in this record indicates that officers left Francis in the interrogation room for three and one half ours in an effort to elicit a statement. Detective Wills testified that Francis was left in the interrogation room because he and the other officers were doing paperwork in the case and were continuously receiving information from the officers in the field who were collecting evidence near C.J.'s house. Detective Wills also testified during the motion to suppress that Francis had not been placed in a holding cell because the holding cells were used by patrol officers to detain persons they had picked up while on patrol. Detective Wills' explanation notwithstanding, Francis had been arrested. We conclude that under the circumstances there is no significant difference in keeping him in custody in an interrogation room versus a holding cell. In short, this record supports the trial court's conclusion that the statement was voluntary.

Hearsay
As more fully presented in the facts, on the day of the murders Detective Wills questioned Francis as to whether the clothes he was wearing that evening were the same as those he had been wearing earlier in the day, to which Francis replied affirmatively. At that time, Francis' mother stated, "Don't you lie. You weren't wearing those clothes earlier. You told me you got those from a friend." Francis then admitted to the officers that those were not the clothes he had been wearing earlier, and that he had obtained the clothes he was then wearing from his friend, Ghandi. When Wills further inquired as to the location of the clothing that he had been wearing earlier in the day, Francis pulled some checkered shorts from a garbage bag and told the detective that he had been wearing such shorts earlier in the day. Again, his mother stated, "Don't lie. I saw those shorts on the bathroom floor." Francis, once again, admitted that he had not been wearing the checkered shorts earlier and that he thought the clothing he had been wearing earlier was at Ghandi's house. The trial court admitted the defendant's mother's statements, over the defense's objection on hearsay grounds.
Although we conclude that the mother's statements were in fact offered for the truth of the matter asserted, and that they do not fall within any of the exceptions to the hearsay rule, we conclude that the trial court's error in admitting the statements was harmless beyond a reasonable doubt. We note that an error is harmless when the reviewing court can conclude beyond a reasonable doubt that the error did not *129 affect the verdict. State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
The information contained in the statement (i.e., that Francis was wearing certain clothing when he left his home earlier that day, and different clothing when he returned home that evening) was properly in evidence through the testimony of both R.G. and Detective Wills. Specifically, R.G. testified that when Francis left the house in the morning he was wearing a white T-shirt and blue shorts. However, when Francis returned to his mother's home that night, Detective Wills saw him wearing a light blue Orlando Magic tank top and blue faded denim shorts. Moreover, and of critical importance, immediately after his mother's statements, Francis admitted to Detective Wills that the clothing he was wearing at that time was different from that which he had been wearing when he left his house. His own statements are, clearly, admissible as an admission by a party opponent. See § 90.803(18)(a), Fla. Stat. (1997). Accordingly, we find that any error committed by the trial court in admitting Francis' mother's statements was harmless beyond a reasonable doubt. See, e.g., Kearse v. State, 662 So.2d 677, 684-85 (Fla.1995) (finding erroneous admission of hearsay testimony harmless beyond a reasonable doubt where same information was admitted through testimony of other witnesses).

Read Back of Testimony
Francis also argues that the trial court erred in failing to read back C.J.'s testimony upon the jury's request during deliberations. The record in the present case indicates that after the jury began deliberating, the court received a note from the jury requesting a written list of witnesses, the tape recording of Francis' statement to police, and C.J.'s testimony. The court discussed the request with counsel. The first two items were not a problem for anyone. As to C.J.'s testimony, the court stated that the jury might be under the misapprehension that a transcript of C.J.'s testimony existed, which the jurors could read themselves. The court determined that it would be necessary to explain that there was no transcript, and that the court reporter would be required to do a read back from the notes. Defense counsel had no objection to so informing the jury.
The jury was brought into the courtroom. As to C.J.'s testimony, the court explained:
[Y]ou requested C.J.'s testimony. And I need to explain I am not quite sure what you mean. Let me explain that sometimes jurors think we can hand you a transcript; that's not possible. If you wish to hear all or part of Charles Hicks' testimony, it requires the Court Reporter to read it back from her notes, and that is certainly possible. I just need to know whether that's what you want, all of it or part of it. Do you understand that's what it involved? It means that she'll set it up and read back the testimony with all of us present; if that's what you desire.
The jury returned to the jury room for consideration of this matter, and by written note informed the court that it wished to hear C.J.'s direct testimony. Defense counsel objected to that, insisting that if the entire direct were read, the cross examination would have to be read also. The court agreed.
The jury returned to the courtroom and the transcript of Francis' statement was replayed. The court then told the jury:
The bailiff is also going to send some menus now being lunchtime. You can order in some lunch. In view of your general question for the testimony of Mr. Hicks, it would be necessary for us *130 to do an unfair read back.[14] It is anticipated that the read back will take a little over three hours, so if you decide you still want it, let us know, we'll do it after lunch. If you don't want it, that's okay, it is up to you entirely.
Outside the presence of the jury, the court asked defense counsel for comment. Defense counsel had no comment, and interposed no objection of any kind. Counsel for both parties left the courthouse for lunch, and when they returned, learned that the jury had generated two additional notes. The first stated, "We want to hear that testimony now, forget lunch." Shortly thereafter, a second note stated, "Never mind the question. Hold the request, hold up for now." No objections or motions were made by counsel for either side. The verdict was published after the jury had concluded its deliberations.
Because no objection was interposed at trial, any error with respect to the read back is not properly preserved for review. The only exception to this procedural rule is if the alleged error is of a fundamental nature. See McDonald v. State, 743 So.2d 501 (Fla.1999). It is well established that trial judges have broad discretion in deciding whether to read back testimony. See State v. Riechmann, 777 So.2d 342 (Fla.2000); Henry v. State, 649 So.2d 1361, 1365 (Fla.1994); Coleman v. State, 610 So.2d 1283, 1286 (Fla.1992). In Riechmann, we noted, in deciding that no error had occurred, that the judge met with both parties prior to responding to the jury's request, and that the testimony which was not read back was that of a State witness which would have prejudiced the defense. See id. at 365. Similarly, in this case, the judge had extensive discussions with both parties prior to responding to the jury. During those discussions, defense counsel agreed with the trial court that the jury should be told that the read back of C.J.'s testimony would take three hours. This strategy would have favored the defense since the testimony that was requested was that of the State's key witness.
Additionally, courts have found no abuse of discretion even where the trial judge has, without much consideration, entirely rejected the jury's request for a read back. See, e.g., McKee v. State, 712 So.2d 837, 838 (Fla. 2d DCA 1998) (holding that trial judge who failed to read back testimony of victim upon jury's request, but instead told jurors to rely on their own memory, did not abuse his broad discretion). Courts have consistently found no abuse of discretion in denial of a jury's request for a read back when doing so would not be practical. See, e.g., Miller v. State, 605 So.2d 492, 495 (Fla. 3d DCA 1992) (finding no abuse of discretion where court reporter did not have her notes with her); DeCastro v. State, 360 So.2d 474 (Fla. 3d DCA 1978) (finding no abuse of discretion where it was not practical because testimony was extensive and court reporter was physically exhausted).
In this case, the trial court did not refuse to provide a read back of C.J.'s testimony. Although the trial court informed the jurors that reading back C.J.'s testimony would take approximately three hours, the record indicates that the trial court made it abundantly clear that the ultimate decision was theirs. In the present case, the jury only heard Francis' statement because, after hearing it, they decided they did not wish to again hear C.J.'s testimony. *131 It was the jury's decision to not hear C.J.'s testimony repeated. Accordingly, we find that the trial judge did not abuse his discretion.

Motion for Judgment of Acquittal
Francis also alleges that the court erred in denying his motion for judgment of acquittal. In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). The relevant standards as to this issue have been set forth by this Court in State v. Law, 559 So.2d 187, 188-89 (Fla.1989) (citations and footnote omitted), when we stated:
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
. . . .
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
In this case, the defense's theory of innocence was that Francis had absolutely no involvement in this case and that, instead, it was C.J. who committed the murders, robberies, burglary, and grand theft of the victims' vehicle.[15]
Specifically, the defense argued that there was no physical evidence placing the defendant inside the victims' home on the day of the murders. Rather, Francis suggests that at least one piece of physical evidence found inside the victims' home ties C.J. to the crimes (i.e., the .22 caliber spent casing). This casing was fired from the .22 rifle belonging to C.J., which was recovered near C.J.'s home. The defense also points out that the footprints found inside the home were made by a Nike sneaker, ranging in size from eight to ten. C.J.'s shoe size is eight and he admitted that he has owned Nike shoes. Francis' shoe size is eleven and the shoe print expert specifically excluded the possibility that the print could have been made by a size eleven sneaker. Additionally, the defense argues that the wheelbarrow used in burning the items on the day of the murders was in C.J.'s possession and that it was ultimately C.J. who produced the stolen items for the police. They assert that Francis' only contact with the stolen items was as a result of C.J. showing them to Francis. Finally, the defense maintains that C.J.'s wife cannot provide an alibi for *132 him because she cannot account for his presence in their home during certain portions of the day.
As to the theory that C.J. was the killer, the evidence presented by the State established that there was no connection between C.J. and the victims. C.J. lived approximately four miles away from the victims' home. There was affirmative testimony that C.J. did not know the victims, had never had any contact with them, and had never been in their house or car. Additionally, although the casing recovered in the victims' home was fired from a rifle owned by C.J., the testimony indicated that the rifle was kept in the unlocked abandoned shack adjacent to C.J.'s house. In the light most favorable to the State, the jury could have reasonably concluded that the defendant took the rifle from the unlocked shack. As to the shoe prints inside the home which were made by a shoe ranging in size from eight to ten, but definitely not eleven, the State presented evidence that on the day Francis was arrested, he was wearing size nine-and-one-half sneakers. Finally, C.J.'s wife testified that C.J. had been inside his house or immediately outside the house working on his car during the entire morning and early afternoon. Thus, she did furnish an alibi for C.J..
When reviewed in the light most favorable to the State, we find that there is "competent evidence from which the jury could infer guilt to the exclusion of all other inferences." Law, 559 So.2d at 189.

Sufficiency of Evidence
Having determined that the record contains competent, substantial evidence which is inconsistent with Francis' theory of innocence, we must next determine whether there is competent, substantial evidence to support the jury's verdict. See Law, 559 So.2d at 188. After a thorough review of the record, we find that such competent, substantial evidence exists.

1. First Degree Murder
In this case the State presented arguments directed to both premeditated murder and felony murder with robbery as a basis for conviction. The jury returned a general verdict of guilt as to both first-degree murder counts.
First, as we analyze the theory of premeditated murder it is clear that in Jimenez v. State, 703 So.2d 437, 440 (Fla.1997), receded from on other grounds in Delgado v. State, 776 So.2d 233 (Fla.2000), we held that "[t]he deliberate use of a knife to stab a victim multiple times in a vital organ is evidence that can support a finding of premeditation." See also Preston v. State, 444 So.2d 939, 944 (Fla.1984) (finding evidence sufficient to support theory of premeditated murder where defendant brutally stabbed the victim multiple times, severing her carotid arteries and jugular vein); Hartman v. State, 728 So.2d 782, 784-85 (Fla. 4th DCA 1999) (concluding that evidence was sufficient to support premeditated murder theory where stab wounds penetrated victim's major organs). In the present case, the evidence established that Mrs. Flegel was stabbed twenty-three times, including one stab wound four to five inches deep that penetrated her liver with another wound severing her jugular vein. As to Mrs. Brunt, the evidence established that she received sixteen stab wounds, including one which severed her jugular vein and two others, three to four inches deep, which punctured a lung. As a result, we find that the evidence supported a finding of premeditated murder as to both victims.

2. Felony Murder/Robbery
Robbery is defined as "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of *133 the taking there is use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat. (1997). An act is considered "`in the course of the taking' if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitutes a continuous series of acts or events." § 812.13(3)(b).
While the taking of property after the use of force can sometimes establish a robbery, we have held that the taking of property after a murder, where the motive for the murder was not the taking, does not support a robbery finding. Compare Mahn v. State, 714 So.2d 391, 397 (Fla. 1998) (finding evidence insufficient to support robbery where "the homicides appear to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for his father's attention"); and Knowles v. State, 632 So.2d 62, 66 (Fla.1993) (striking "during the course of a felony" (robbery) aggravator where evidence did not indicate that defendant who shot his father and drove off in father's truck intended to take the truck prior to the shooting, nor did it indicate that he shot his father in order to take the truck); with Finney v. State, 660 So.2d 674, 680 (Fla.1995) (concluding that evidence which established that victim's VCR was pawned by defendant within hours of murder, that victim's jewelry box was missing, and that victim's bedroom was ransacked negated Finney's "afterthought" argument and was sufficient to support robbery conviction); and Jones v. State, 652 So.2d 346, 350 (Fla.1995) (rejecting "afterthought" argument where no other motivation for murders was apparent from the record). In the present case, the evidence does not support the inference that murder was the primary motive and robbery was an afterthought. Rather, the record evidence overwhelmingly indicates that pecuniary gain was the primary motive for the murders. The testimony established that Francis, who was unemployed at the time, wanted to buy some type of firearm. The testimony also indicated that he had a heroin addiction. Shortly after this criminal episode, Francis went to C.J.'s house to purchase heroin. He also asked C.J. to pawn the items for him and indicated an interest to at least three people in buying some type of firearm. Moreover, no evidence presented at trial indicated any tension between the victims and the defendant. As such, we conclude that there is competent, substantial record evidence to support the robbery convictions.

3. Burglary and Grand Theft
Francis relies on our recent decision in Delgado to argue that, because there were no signs of forced entry and because he knew the victims, the evidence indicates that he was invited into the home. Thus, according to Francis, under Delgado, the evidence was insufficient to support the burglary conviction. In Delgado, we held that burglary is not intended to cover a situation where an invited guest turns criminal or violent once he peaceably gains entry. See 776 So.2d at 236, 240-41. Delgado, however, reiterates the well-settled rule that the burden is on the defendant to establish consent. See id. at 240. In this case, the defendant at no point argued, or even suggested, that the victims invited him into the home. It is important to note that the absence of evidence of forced entry and the presence of evidence indicating that a defendant is known to the victims does not necessarily translate into entry by consent as a matter of law. There are a host of non-consensual scenarios, including: the defendant entered, without an invitation, through an unlocked door; the defendant used the key that the victims kept hidden; or the defendant pushed his way into the house after the *134 victims opened the door in response to his knock.
Moreover, "unexplained possession of recently stolen property is not only sufficient to support a theft conviction, but when a burglary necessarily occurs as an adjunct, the inference of guilt from the unexplained possession of the recently stolen goods also supports a conviction for burglary." T.S.R. v. State, 596 So.2d 766, 767 (Fla. 5th DCA 1992); see also Consalvo v. State, 697 So.2d 805, 815 (Fla.1996); Blanco v. State, 452 So.2d 520, 525 (Fla.1984). The defendant's explanation for his possession of recently stolen items is a question of fact to be resolved by the jury. See, e.g., Barnlund v. State, 724 So.2d 632, 633 (Fla. 5th DCA 1998); T.S.R. 596 So.2d at 767. In this case, the testimony established that Francis had been in possession of two gold pocket watches, some old coins, a necklace, a radio, and a car, all matching the description of items recently stolen from the victims' home. Francis explained to the detectives that he touched the pocket watches and the coins when they were shown to him by C.J. On the other hand, C.J. testified that Francis had possession of the items and produced them for C.J. to see as Francis requested assistance in attempting to pawn the items. Because the reasonableness of the explanation is a question for the jury to decide, and because in this case, it is obvious that they believed C.J.'s testimony, the evidence is sufficient to support a finding on the burglary conviction and the grand theft of the automobile conviction.
Accordingly, we conclude that Francis' convictions are supported by competent, substantial record evidence.

HAC Aggravator
Francis next alleges that the HAC aggravating circumstance is unconstitutional. In Hall v. State, 614 So.2d 473, 478 (Fla.1993), this Court upheld an HAC instruction which, unlike the one invalidated in Espinosa v. Florida, 505 U.S. 1079, 1081-82, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), specifically defined the terms "heinous," "atrocious" and "cruel". The Court reasoned that the instruction provided sufficient guidance so as to save both the instruction and the aggravator from a vagueness challenge. See 614 So.2d at 478. The HAC instruction given in this case is the exact instruction approved by this Court in Hall. Since Hall, this Court has consistently upheld the constitutionality of this aggravator instruction. See, e.g., Nelson v. State, 748 So.2d 237, 245 (Fla. 1999); Walker v. State, 707 So.2d 300, 316 (Fla.1997).
Francis also claims that the trial court erred in finding that the murders satisfied the elements to be classified as HAC. For HAC to apply, the crime must be conscienceless or pitiless and unnecessarily torturous to the victim. See, e.g., Nelson, 748 So.2d at 245; Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). The HAC aggravator has been consistently upheld where, as occurred in this case, the victims were repeatedly stabbed. See, e.g., Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998); Brown v. State, 721 So.2d 274, 277 (Fla.1998); Atwater v. State, 626 So.2d 1325, 1329 (Fla.1993).
In this case, the medical examiner testified that Mrs. Brunt was stabbed sixteen times and Mrs. Flegel was stabbed twenty-three times. Although Mrs. Flegel's lack of defensive wounds does not necessarily indicate that she was unconscious throughout her attack, Mrs. Brunt's defensive wound tends to indicate that she was conscious during at least some part of her attack. Additionally, Francis' contention that the victims "may have been instantaneously killed" is not supported by the *135 record. The medical examiner's testimony in this respect was that the victims could have remained conscious for as little as a few seconds and for as long as a few minutes. It is important to note that we have upheld a finding of HAC where the medical examiner has determined that the victim was conscious for merely seconds. See Rolling v. State, 695 So.2d 278, 296 (Fla.1997) (upholding HAC where medical examiner concluded that victim was conscious anywhere between 30 and 60 seconds after she was initially attacked); Peavy v. State, 442 So.2d 200, 202-03 (Fla. 1983) (upholding finding of HAC where medical examiner testified that victim lost consciousness within seconds and bled to death in a minute or less and there were no defensive wounds).
Moreover, as we have previously noted, "the fear and emotional strain preceding the death of the victim may be considered as contributing to the heinous nature of a capital felony." See Walker, 707 So.2d at 315; see also James v. State, 695 So.2d 1229, 1235 (Fla.1997) ("[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel."). In this case, although the evidence did not establish which of the two victims was attacked first, the one who was first attacked undoubtedly experienced a tremendous amount of fear, not only for herself, but also for what would happen to her twin. In a similar manner, the victim who was attacked second must have experienced extreme anguish at witnessing her sister being brutally stabbed and in contemplating and attempting to escape her inevitable fate. We arrive at this logical inference based on the evidence, including photographs presented at the guilt phase, which clearly establishes that these two women were murdered in their home only a few feet apart from each other. As a result, we conclude that the trial court's HAC finding is further buttressed by the logical fear and emotional stress experienced by the two elderly sisters prior to their deaths as the events were unfolding in close proximity to one another.[16]
Finally, Francis' argument that he was mentally ill at the time of the murders, and was, therefore, incapable of forming an intent to cause prolonged suffering or torture is also without merit. "The intention of the killer to inflict pain on the victim is not a necessary element of the aggravator.... [T]he HAC aggravator may be applied to torturous murders where the killer was utterly indifferent to the suffering of another." Guzman, 721 So.2d at 1160 (citing Kearse v. State, 662 So.2d 677 (Fla.1995), and Cheshire v. State, 568 So.2d 908 (Fla.1990)). The Court has also noted that, "[u]nlike the [CCP] aggravator, which pertains specifically to the state of mind, intent and motivation of the defendant, the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown, 721 So.2d at 277; see also Stano v. State, 460 So.2d 890, 893 (Fla.1984). Thus, the facts in this case clearly support the trial court's finding that the murders were HAC.

*136 Felony Murder Aggravator

Francis' claim that the murder in the course of a felony aggravator is unconstitutional because it automatically expands the class of persons eligible for the death penalty has been repeatedly rejected by this Court. See, e.g., Hudson v. State, 708 So.2d 256, 262 (Fla.1998); Blanco v. State, 706 So.2d 7, 11 (Fla.1997). Specifically, in Blanco, the Court held that "[e]ligibility for this aggravating circumstance is not automatic: The list of enumerated felonies in the provision defining felony murder is larger than the list of enumerated felonies in the provision defining the aggravating circumstance of commission during the course of an enumerated felony." 706 So.2d at 11 (footnotes omitted).
Additionally, Francis argues that his convictions of aggravated battery and robbery, which were applied to support this aggravator, were based solely on circumstantial evidence. As to the aggravated battery conviction, the sentencing order indicates that the trial court did not, and indeed could not, rely on this conviction to support this aggravator since aggravated battery is not one of the felonies enumerated under section 921.141(5)(d), Florida Statutes (1999).[17] As to the robbery conviction, and as we have previously explained, we find that the evidence presented at trial was sufficient to support such conviction.

Prior Violent Felony Aggravator
Francis also takes issue with the finding of the prior violent felony aggravator in this case. This Court has repeatedly held that where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim. See, e.g., Mahn v. State, 714 So.2d 391, 399 (Fla.1998); Walker v. State, 707 So.2d 300, 317 (Fla.1997). Accordingly, we determine that the lower court correctly found that the conviction as to Mrs. Brunt aggravated the conviction as to Mrs. Flegel, and vice versa. Also, there is no problem with the instruction given in connection with this aggravator because the instruction specifically tracks Florida law as set forth by this Court. See James v. State, 695 So.2d 1229, 1236 (Fla.1997) (declining to find error where jury instruction was "consistent with our caselaw finding that violent felonies committed contemporaneously with the capital crime can qualify under the `prior violent felony' aggravator where, as here, the criminal episode involved multiple victims"); see also Pardo v. State, 563 So.2d 77 (Fla.1990); Wasko v. State, 505 So.2d 1314 (Fla.1987).

Pecuniary Gain Aggravator
Next, Francis challenges the trial court's finding that the murders were committed for pecuniary gain. In this case, the trial court's sentencing order appropriately recognized that the pecuniary gain aggravator must merge with the murder in the course of a felony aggravator when the latter is based on a robbery conviction. See Provence v. State, 337 So.2d 783 (Fla.1976). The sentencing order specifically notes that "[t]he Court did not consider [pecuniary gain] as an additional aggravating factor." Thus, contrary to Francis' argument, there was no improper doubling of two aggravators.
Further, Francis' argument that the lower court erred in instructing the jury on both aggravators is not supported *137 by the record. Specifically, the penalty phase transcript does not indicate that the jury was ever instructed on the felony murder aggravator; they were only instructed on the pecuniary gain aggravator. Nevertheless, even if the trial court had instructed the jury on both aggravators, our case law indicates that where the jury is instructed on both of those aggravators, no error occurs so long as the judge ultimately merges the two into one, as was done in this case. See, e.g., Gaskin v. State, 737 So.2d 509, 516 n. 13 (Fla.1999) ("[A]ny error in considering both factors would have been harmless because the trial judge merged the pecuniary gain aggravator with the murder committed during the course of a [robbery] aggravator.").
Throughout his discussion of the issues relating to the prior conviction of a violent felony aggravator, the murder in the course of a felony aggravator, and the pecuniary gain aggravator, Francis argues that the finding of these three aggravators has an impermissible tripling effect. This argument is unavailing.
First, as already pointed out, the trial court's sentencing order is clear that the pecuniary gain and the felony murder aggravators were merged as one. Second, the trial court based its finding of a prior conviction of a violent felony on the contemporaneous murders of the two victims. The felony murder aggravator, on the other hand, was supported not by the murder convictions, but by the robbery convictions. Because each aggravating factor (felony murder/robbery and prior conviction of a violent felony) was supported by a separate felony conviction, we find that the lower court committed no error. See Walker, 707 So.2d at 317 (finding no error where sentencing order relied on defendant's contemporaneous murder convictions as to multiple victims in support of the prior conviction of a violent felony aggravator, and then relied on a kidnaping and burglary conviction, also committed within the same criminal episode, in support of the felony murder aggravator).

Particularly Vulnerable Victim Aggravator
Section 921.141(5)(m), enacted on May 30, 1996, allows for the finding of an aggravating circumstance where:
The victim of the capital felony was particularly vulnerable due to advanced age or disability, or because the defendant stood in a position of familial or custodial authority over the victim.
In its sentencing order, the trial judge noted:
The evidence established that the twin sisters were 66 years of age. They appeared to be in reasonable health for their age. No particular disability was shown. The legislature has clearly shown that it considers advanced age a specific circumstance worthy of consideration in a capitol [sic] sentencing. Both victims were clearly in this protected class and this factor was proved beyond a reasonable doubt.
On appeal, Francis challenges the facial validity of the aggravator on vagueness grounds and its application in this case. The validity of this aggravating circumstance or the corresponding instruction has never been addressed. Indeed, this Court has never reviewed a case in which this aggravator has been applied.[18]
In Tuilaepa v. California, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the *138 United States Supreme Court established the constitutional criteria for aggravating circumstances. First, the Court determined that, to be constitutional, an aggravating circumstance must "not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder." Id. at 972, 114 S.Ct. 2630. In this case, the aggravator at issue meets this requirement since not every murder victim will be a person who is of advanced age or disabled; and not every defendant will stand in a familial or custodial capacity with the victim. There is no danger that reasonable jurors will find this aggravator in every case. Second, the aggravator must not be unconstitutionally vague. See id. at 973, 114 S.Ct. 2630. In relation to this requirement, the Court explained that the vagueness review of an aggravating circumstance is "quite deferential" and that it is not necessary for an aggravator to be "susceptible of mathematical precision." Id. The Court also added that a "factor is not unconstitutional if it has some `common-sense core of meaning ... that criminal juries should be capable of understanding.'" Id.
As it relates to this case, Francis' challenge is based on the alleged vagueness of the terms "particularly vulnerable" and "advanced age." Our jurisprudence indicates that "where a statute does not specifically define words of common usage, such words are construed in their plain and ordinary sense." State v. Hagan, 387 So.2d 943, 945 (Fla.1980) (relying on dictionary definition of "trawl net" to find statute not unconstitutionally vague), cited with approval in State v. Mitro, 700 So.2d 643, 645 (Fla.1997) (using dictionary to define words "available" and "authentic" when statute containing these words was challenged for vagueness); L.B. v. State, 700 So.2d 370, 372 (Fla.1997) (relying on dictionary definition when words "common pocketknife" were challenged as vague); see also Arave v. Creech, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (reiterating well-settled principle that there is a presumption that the legislature intends for words to have their ordinary, everyday meaning). Merriam Webster's Dictionary (10th ed.1999) defines "particularly" as "to an unusual degree;" "vulnerable" as "open to attack or damage;" "advanced" as "far on in time or course;" and age as "the length of an existence extending from the beginning to any given time." These are words clearly comprehended by the average citizen.
Moreover, although a vagueness challenge to this aggravator is an issue of first impression in Florida, other jurisdictions employing the same terminology have determined that the terms at issue are not vague, and have upheld the constitutionality of the statutes in which they appear. See, e.g., United States v. Pretlow, 779 F.Supp. 758, 774 (D.N.J.1991) (holding that "particularly vulnerable due to youth" aggravator was not unconstitutionally vague, reasoning that "particularly vulnerable" was not unconstitutionally vague because it did not stand in isolation, but instead was modified by the language "due to youth"); In re Guardianship of Slaughter, No. 1135, 1983 WL 3102 *4 (Ohio Ct.App. Jan. 21, 1983) (finding "nothing unconstitutional about the term `advanced age'"); People v. Smith, 94 Cal.App.3d 433, 156 Cal.Rptr. 502, 503 (1979) ("We find no vagueness in the term `particularly vulnerable'.... Particularly, as used here, means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act."). Based on the above, we determine that this aggravating circumstance is not facially vague.
*139 As to the application of the aggravator in this case, however, the record indicates that both women were active 66 year olds. They drove around in their vehicle and often attended garage sales. Moreover, there is no evidence that the women required any assistance to tend to their daily needs. There was also testimony from both daughters, as well as the medical examiner, that the women were in good health. In fact, one of the daughters testified that the victims had begun to take better care of themselves after they became grandparents because they wanted to make sure they would be able to enjoy their grandchildren.
In its sentencing memorandum, the State wrote that "[t]his aggravating factor is supported by their ages, the manner of death, and the nature of the wounds inflicted upon them." First, the manner of the death and the nature of the wounds appear to have very little relationship to the vulnerability of the victims prior to their death. If that were the case, every murder victim would be vulnerable. Second, finding that this aggravator applies as a matter of law by virtue of the fact that they were 66 years old is insufficient. The statute clearly reads that the person must not only be of "advanced age," but must instead be "particularly vulnerable due to advanced age." In the present case, no evidence was introduced which was directed to or which would support a finding that these victims were particularly vulnerable. Additionally, by not establishing a bright-line age requirement in connection with this aggravator, it appears that the legislature intended to make this aggravating circumstance fact-sensitive, requiring more than a birth certificate date to establish this aggravator. Cf. § 921.141(5)(l) (making it an aggravator where the "victim of the capital felony was a person less than 12 years of age"). In fact, a review of the legislative history of this aggravator indicates that the Legislature considered a scheme similar to those found in Delaware[19] and Wyoming,[20] which would allow for the finding of an aggravating circumstance when the victim is "62 years of age or older" or where the victim is "older than 65 years of age," respectively. See Fla. S. Comm. On Crim. Just. SB 158 (1996) Staff Analysis 2 (Apr. 4, 1996). Rather, the Legislature opted to follow New Hampshire's model which does not define a specific age, but instead predicates the aggravator on the concept that "[t]he victim was particularly vulnerable due to old age, youth, or infirmity." N.H.Rev.Stat. Ann. § 630:5(VII)(g)(1996).
Because the State presented no evidence in support of this aggravator, other than the fact that the victims were 66 years old, we conclude that this aggravator was not supported by the evidence.

Cross Examination of Mental Health Experts
Next, Francis asserts that during cross-examination, the prosecutor improperly questioned both defense mental health experts on the defendant's sanity and competency. Noticeably, defense counsel interposed no objection to the State's cross-examination of the two defense mental health experts on this issue. Assuming, however, that this issue was properly preserved for review, defendant's argument is entirely without merit. Francis asserts in his initial brief that matters relating to sanity and competency were outside the scope of direct examination. The record in this case indicates otherwise because during the direct examination of Dr. Perry *140 and Dr. Hession, defense counsel specifically asked whether, in their opinion, the defendant was either insane or incompetent. Both doctors testified that Francis was neither incompetent nor insane. On cross-examination, the prosecutor simply and very briefly inquired into both of those issues.
In this respect, it is well established that cross-examination extends to the "entire subject matter" of the direct examination including "all matter[s] that may modify, supplement, contradict, rebut or make clearer the facts testified to" on direct. See generally Embrey v. Southern Gas & Electric Corp., 63 So.2d 258, 262 (Fla.1953). Because the defense questioned both experts on Francis' competency and sanity, it would appear that they opened the door to questioning on the same subject matter by the State. Thus, no error occurred.

Weight Assigned to Mitigating Evidence
Defendant also takes issue with the weight given by the trial court to the statutory mental mitigator that the "felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." § 921.141(6)(b), Fla. Stat. (1997). Specifically, he argues that the trial court improperly considered the defendant's sanity and competency in diminishing the weight accorded to this mitigating circumstance.
In its sentencing order, the trial court noted:
Although not raised by the defendant, the Court feels compelled to include another statutory factor for discussion. That being that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. This is under Florida Statute 921.141(7)(b) [sic].
The two mental health experts established clearly that the defendant suffers from mental illness. Their diagnoses of the defendant were classic paranoid disorders which may have been affecting the defendant at the time of the killings. While it has been shown that the defendant suffers from this chronic mental illness it has not been shown that the defendant was under any particular acute distress at the time of the killings. Indeed, both experts testified that the defendant was capable of planning and executing the crimes as well as his attempts at covering up his misdeeds afterward. They both believed that the defendant could at all times distinguish between right and wrong.
Nonetheless, the Court gave this some weight.
A finding of sanity does not preclude consideration of the statutory mitigating factors concerning a defendant's mental condition. See, e.g, Morgan v. State, 639 So.2d 6, 13 (Fla.1994) (finding error in trial court's rejection of mental mitigators on the basis that the defendant was sane); Knowles v. State, 632 So.2d 62, 67 (Fla.1993) (remanding for resentencing where trial court failed to find statutory mental mitigation because the defendant was sane even though evidence indicated that defendant suffered from organic brain damage and that he was in an acute psychotic state at the time of the murder); Huckaby v. State, 343 So.2d 29, 33-34 (Fla. 1977) (vacating death sentence where trial court completely ignored evidence of mental mitigation partially on the basis that the defendant understood the difference between right and wrong); cf. Smith v. State, 407 So.2d 894, 902 (Fla.1981) (declining to follow Huckaby where the trial court considered mental mitigation, but found that the testimony did not compel application of mental mitigators).
*141 Perceptibly, these cases, including the two relied on by Francis (Morgan and Knowles), involve an utter disregard of any mental mitigators. In the instant case, on the other hand, there was no such refusal to consider mental mitigation. In fact, the trial court in this case went beyond that which the defense suggested and found the mental statutory mitigator that the defendant was under the influence of extreme mental or emotional disturbance at the time of the offense, giving it "some weight." In this respect, it is important to note that the weight to be assigned to a mitigating factor lies within the sound discretion of the trial court. See Mansfield v. State, 758 So.2d 636 (Fla.2000); Campbell v. State, 571 So.2d 415, 420 (Fla.1990). Moreover, not only did the trial court find a statutory mitigator that was not even urged by the defense, he also found, as a nonstatutory mitigator, that the defendant was mentally ill or emotionally disturbed and accorded it "considerable weight." Based on the above, we find no error.

Proportionality
As his penultimate claim, Francis asserts that the death penalty was disproportionately applied in his case. This Court's proportionality review focuses on the totality of the circumstances in one case and compares it with other similar capital cases to ensure uniformity in application. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). After thoroughly reviewing the circumstances in the instant case, we find the death penalty proportionate. See, e.g., Bates v. State, 750 So.2d 6 (Fla.1999) (upholding death sentence where murders were HAC, committed during the commission of a felony and for pecuniary gain, and mitigation consisted of no significant history of prior criminal conduct; appellant's age (24 years old) at the time of the crime; crime was committed while defendant was under some emotional distress and while appellant's capacity to conform his conduct to the requirements of the law was impaired to some extent); James v. State, 695 So.2d 1229 (Fla.1997) (upholding death sentence for a stabbing death where trial court weighed HAC, conviction of a prior violent felony or felony involving use or threat of violence (based on the contemporaneous murder) and committed during the course of a felony aggravators against one statutory and one nonstatutory mental mitigator).

Death by Electrocution is Unconstitutional
In his final issue on appeal, Francis argues that death by electrocution is unconstitutional. This issue has been decided adversely to Francis' position. See Provenzano v. Moore, 744 So.2d 413 (Fla. 1999) (finding that death by electrocution does not constitute cruel and unusual punishment despite claim that it violates evolving standards of decency); see also Sims v. State, 754 So.2d 657 (Fla.2000) (analyzing switch to lethal injection and determining that retroactive application of the legislative change does not violate state or federal ex post facto clause; death by lethal injection is neither cruel nor unusual; the new law is sufficiently definite and it does not violate principle of separation of powers).

CONCLUSION
In sum, we affirm Francis' first-degree murder convictions and death sentences. We also affirm his convictions and sentences for one count of grand theft, one count of burglary with assault or battery, and two counts of robbery with a deadly weapon.
It is so ordered.
*142 WELLS, C.J., and HARDING, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs in result only with an opinion, in which SHAW and ANSTEAD, JJ., concur.
PARIENTE, J., concurring in result only.
I concur in result only for the following reasons. As to the majority's discussion of premeditation, see majority op. at 132, although I agree that there was sufficient evidence to support a finding of premeditation, I do not agree that multiple stab wounds alone support a finding of premeditation. See Green v. State, 715 So.2d 940, 944 (Fla.1998); Kirkland v. State, 684 So.2d 732, 734-35 (Fla.1996). Rather, as this Court repeatedly has explained, we must look to all the circumstances in the case and the reasonable inferences therefrom:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Green, 715 So.2d at 944 (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)).
In this case, there is an absence of provocation or previous difficulties between the parties. There is no suggestion that the defendant was surprised by the presence of the victims. Certainly, the nature of the stab wounds, the number of stab wounds and the fact that there were two victims further support the element of premeditation.
As to the majority's discussion of HAC, I agree that the nature and extent of the multiple stab wounds were sufficient to support a finding of HAC based on the evidence in this case and the testimony of the medical examiner, who stated that the victims were conscious during part of the fatal attack. In cases involving stabbings, intent to inflict pain or utter indifference to the suffering of another may properly be inferred, unless the circumstances of the crime or the mental state of the defendant demonstrate a lack of such intent or utter indifference.
Furthermore, I agree with the majority that the mere existence of mental illness would not preclude a finding of HAC if the circumstances otherwise establish that the defendant acted with a desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. See majority op. at 135. We have never held that the existence of a mental illness or a finding of statutory mitigation such as that the defendant was under the influence of extreme mental or emotional disturbance or that the defendant's ability to conform his conduct to the requirements of law was substantially impaired would preclude the trial court from finding HAC as a matter of law. Indeed, in this case, the trial court found that although the defendant suffered from chronic mental illness and although his mental illness "may" have been affecting him at the time of the murders, it was not established that the defendant was under any particular acute distress at the time of the murders. See majority op. at 122 n. 12. There is nothing about that finding alone that is inconsistent with a finding of HAC.
I disagree, however, with the majority's blanket statement that "[t]he intention of the killer to inflict pain on the victim is not a necessary element of the [HAC] aggravator." Majority op. at 135. As to the HAC aggravator, we definitively stated in State v. Dixon, 283 So.2d 1, 9 (Fla.1973), a landmark decision explaining why we were upholding Florida's death penalty scheme against constitutional attack:

*143 The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony. Fla.Stat. s 921.141(6)(h), F.S.A. Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies-the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

(Emphasis supplied.)
Our explanation and definition of HAC from Dixon was then codified in the Florida Standard Jury Instructions, which provides:
The crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel. "Heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageously wicked and vile. "Cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of, the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.
Fla. Std. Jury Instr. (Crim.) Homicide at 110. Black's Law Dictionary defines the word "designed" as "Contrived or taken to be employed for a particular purpose .... The term may be employed as indicating a bad purpose with evil intent." Black's Law Dictionary 447 (6th ed.1990). Therefore, both our decision in Dixon and Florida's Standard Jury Instructions recognize and require an intent element in order to establish the HAC aggravator.
Although the majority cites to Kearse v. State, 662 So.2d 677 (Fla.1995), for the proposition that the intent to inflict pain on the victim is not a necessary element of the HAC aggravator, in explaining the requisite intent for a finding of HAC, the Court in Kearse actually stated that the HAC aggravator applies if the defendant "exhibits a desire to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of another." 662 So.2d at 686. This statement is consistent with Dixon and the Standard Jury Instructions. Thus, in Kearse, the Court concluded that the trial court erred in finding HAC because although the victim "sustained extensive injuries from the numerous gunshot wounds, there [was] no evidence that Kearse `intended to cause the victim unnecessary and prolonged suffering.'" Id. (quoting Bonifay v. State, 626 So.2d 1310, 1313 (Fla.1993)).
Similarly, in Cheshire v. State, 568 So.2d 908, 912 (Fla.1990), another case relied upon by the majority, the Court held that the trial court improperly found the HAC aggravator because the physical evidence did not support a finding that the murder was committed with the requisite "desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Again, this is consistent with Dixon and the Standard Jury Instructions.
*144 Furthermore, although the Court in Guzman stated that "[t]he intention of the killer to inflict pain on the victim is not a necessary element of [the HAC] aggravator," 721 So.2d at 1160, this statement must be considered in the context of other statements in the opinion. In Guzman, the Court stated that "[t]he HAC aggravator applies only in tortuous murders-those that evince extreme and outrageous depravity as exemplified either by a desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Id. at 1159. Once again, this statement is consistent with Dixon and the Standard Jury Instructions.
Of course, and perhaps more importantly, this Court often has stated in cases decided both before and after Guzman that the finding of HAC requires a showing that the defendant intended to inflict pain or to torture the victim.[21]See, e.g., Rogers v. State, 783 So.2d 980, 994 (Fla. 2001). For example, in Bonifay, 626 So.2d at 1313, the Court held that the trial court erred in finding the HAC aggravating circumstance because "[t]he record fail[ed] to demonstrate any intent by Bonifay to inflict a high degree of pain or to otherwise torture the victim." Id. Similarly, in Donaldson v. State, 722 So.2d 177, 186-87 (Fla. 1998), the Court addressed a defendant's claim that the trial court erred in finding HAC, stating, "[W]e have rejected application of the HAC aggravator where the evidence indicated that the defendant had not intended to cause the victim any prolonged suffering...." Id. (citing Robinson v. State, 574 So.2d 108, 112 (Fla.1991)). Thus, the Court in Donaldson rejected the finding of HAC, concluding that the evidence in the case did not establish that the defendant intended to cause the victims "an acute awareness of their impending deaths, or that [the defendant] intended to cause them unnecessary pain or prolonged suffering." Id. at 187.
Thus, although I agree with the majority's conclusion in this case that the facts support the trial court's finding of HAC, I emphasize that a finding of HAC under Dixon and its progeny requires evidence from which it can be inferred that the defendant intended to inflict unnecessary pain or suffering upon the victim, otherwise torture the victim, or exhibit indifference to the suffering of another.
SHAW and ANSTEAD, JJ., concur.
NOTES
[1] Immediately adjacent to C.J.'s house was an abandoned shack owned by C.J.'s landlord. This shack was primarily used for storage. A church and day care center was located adjacent to the abandoned shack.
[2] This cab stand is about a five-minute walk away from C.J.'s house.
[3] During the penalty phase, the appellant's mother indicated that that night she sent R.G., G.G., and the elderly aunt to stay with relatives and friends. She says she told Francis to go stay with one of his friends.
[4] Richard Denson, C.J.'s 21 year old nephew, also testified that around the time of the murders, Francis approached him wanting to buy a firearm. Denson responded he did not deal in firearms.
[5] The State theorized that the "pipe" that R.G. had seen sticking out of the bag was this rifle. The defense argued that the boy described the pipe as "silver" and that the rifle had rust spots.
[6] Although in the same area, this shed is not to be confused with the abandoned shack belonging to C.J.'s landlord where Francis had been staying.
[7] Kerry Cutting testified that the latch was the size of her mother's wallet.
[8] Detective Key testified that Westgate Park is about six miles from the taxi stand on Tamarind Avenue.
[9] The State theorized that this knife was used to pry open the metal box.
[10] Although the trial judge initially adjudicated Francis guilty of the two aggravated batteries, he later vacated those judgments, finding those two counts to be covered by the murder convictions.
[11] The jury recommended the death penalty by a vote of eight to four.
[12] The judge found the following statutory aggravators: (1) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to another (contemporaneous murder); (2) the murders were committed while the defendant was engaged in the commission of a robbery; (3) the murders were committed in an especially heinous, atrocious, or cruel manner; (4) the victims were particularly vulnerable due to advanced age.

The court also found two statutory mitigators. First, the court found the defendant's age at the time of the murder to be a mitigator (i.e., 22 years old). This factor received "very little weight." Although not raised by the defense, the court also found that the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance. The judge further noted that although it had been shown that the defendant suffered from chronic mental illnesses, it was not shown that he was under any particular acute distress at the time of the killings. Nevertheless, because his mental illness "may" have been affecting him at the time of the murders, the court gave this statutory mitigator "some weight."
As to nonstatutory mitigators, the court agreed that: (1) Francis is mentally ill or emotionally disturbed (considerable weight); (2) his ability to conform his conduct to the requirements of the law may have been impaired (some weight); (3) he had no significant history of prior violent criminal activity (little weight); (4, 5, 6) the evidence generates sympathy for Francis and his family, the defendant has family and friends who care for him and love him, the defendant has been a loving son, brother, and father, (little weight). Finally, the court rejected the proffered nonstatutory mitigators relating to the defendant's religious activities, and to the suggestion that society can be protected by a life sentence.
[13] Francis raises the following claims: (1) the trial court erred in denying his objection to the State's peremptory challenge of juror Bennett; (2) the trial court incorrectly denied his motion to suppress based on lack of probable cause to arrest; (3) the trial court erred in concluding that he reinitiated contact with detectives after having invoked his right to counsel, and in concluding that his resulting statement was voluntary; (4) the trial court erred in admitting hearsay statements made by his mother; (5) the trial court erred in not providing a read back of C.J.'s testimony; (6) the trial court erred in denying his motion for judgment of acquittal; (7) the evidence is insufficient to support the jury's verdict on all convictions; (8) the heinous, atrocious, or cruel ("HAC") aggravator is unconstitutional on its face and as applied in this case; (9) the felony murder aggravator is unconstitutional on its face and as applied in this case; (10) the prior violent felony aggravator is unconstitutional on its face and as applied in this case; (11) the pecuniary gain aggravator is unconstitutional on its face and as applied in this case; (12) the particularly vulnerable victim aggravator is unconstitutional on its face and as applied in this case; (13) the trial court erred in allowing the prosecutor to question defense mental experts regarding Francis' sanity and competency where insanity and incompetency were not pled (14) the trial court erred in relying on Francis' sanity and competency to diminish the weight given to the mental mitigation; (15) the death penalty is not proportionally warranted in this case; (16) death by electrocution is unconstitutional.
[14] In its answer brief, the State questions whether the court really used the word "unfair," as it makes little sense in this context. Instead, the State suggests that in light of the discussion with counsel which had preceded this communication to the jury, the court likely said "entire" or something similar.
[15] Francis also argues in his brief that because the two knives that contained blood did not contain a combination of blood from both victims, it is likely that two people committed these crimes. This theory was not presented at trial; thus, the State was not required to rebut it.
[16] There is no evidence in the record to suggest that the bodies of the victims had been moved after they were killed. As such, we note that one of the sisters was killed in an area designated the living room and the other was killed in the kitchen area. The evidence, however, shows that these rooms were joined and divided only by a single waist-high counter top. Thus, it would have been impossible for the victims not to have seen each other. Based on the record and close proximity within which the victims were murdered, no speculation is required to conclude that both victims were subjected to appalling amounts of fear and stress before their deaths.
[17] Moreover, and as previously noted, the trial court ultimately vacated its prior adjudication of guilt on the aggravated battery counts, finding that those counts were covered by the murder convictions.
[18] The only Florida case reviewing this aggravator is State v. Hootman, 709 So.2d 1357 (Fla.1998), wherein we addressed the issue of the retroactive application of this aggravator. Hootman was later abrogated for lack of jurisdiction by State v. Matute-Chirinos, 713 So.2d 1006 (Fla.1998).
[19] Del.Code Ann. tit. 11, § 4209(e)(1)(r) (1995).
[20] Wyo. Stat. Ann. § 6-2-102(h)(ix) (2001).
[21] Accord Buckner v. State, 714 So.2d 384, 390 (Fla.1998) (rejecting a finding of HAC where "the entire episode took only a few minutes and no evidence reflected that Buckner intended to subject the victim to any prolonged suffering or torturous suffering"); Hartley v. State, 686 So.2d 1316, 1323 (Fla. 1996) (rejecting HAC because there was "no evidence that Hartley deliberately shot the victim to cause him unnecessary suffering"); Hamilton v. State, 678 So.2d 1228, 1232 (Fla. 1996) (reviewing defendant's challenge to HAC and stating that the issue was "whether the facts surrounding the reloading of the gun... were sufficient to establish beyond and to the exclusion of every reasonable doubt that Hamilton intended to inflict a high degree of pain or otherwise torture the victims"); Stein v. State, 632 So.2d 1361, 1367 (Fla.1994) (holding that there was no evidence presented "to demonstrate any intent on Stein's part to inflict a high degree of pain or to otherwise torture the victims" for purposes of HAC); Santos v. State, 591 So.2d 160, 163 (Fla.1991) (holding that HAC did not exist because there was "no substantial suggestion that Santos intended to inflict a high degree of pain or otherwise torture the victims"); Robinson v. State, 574 So.2d 108, 112 (Fla.1991) (holding that the trial court erred in finding HAC because the fatal shot to the victim "was not accompanied by additional acts setting it apart from the norm of capital felonies, and there was no evidence that it was committed `to cause the victim unnecessary and prolonged suffering'").